| |
|---|
| ASSOCIATED CONSTRUCTION / AP CONSTRUCTION, LLC |
|      Plaintiff, |
| |
|      v. |
| |
| THE HANOVER INSURANCE COMPANY, et al. |
|      Defendants. |

No. 3:15-cv-1600 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

This lawsuit arises out of surety bonds issued for a construction project in Stamford, Connecticut. Associated Construction / A.P. Construction, LLC ("Associated Construction"), a construction contractor, alleges that the issuer of the bonds, Hanover Insurance Company ("Hanover" or the "Surety"), and its alleged agents, Scott Adams, Avalon Risk, LLC ("Avalon"), and Lighthouse Management, LLC ("Lighthouse"), failed to perform under the bonds and other related contracts and made misrepresentations in connection with the project. Associated Construction brings claims for (i) breach of contract (count one); (ii) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. ("CUTPA") (count two); (iii) breach of the covenant of good faith and fair dealing (count three); and (iv) violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-815 et seq. ("CUIPA") (count four).

Now before me is a motion for partial summary judgment brought by Hanover. (ECF No. 151). For the reasons that follow, Hanover's motion for summary judgment (ECF No. 151) is GRANTED IN PART AND DENIED IN PART. It is granted with respect to Associated

Construction's CUIPA claim. It is granted with respect to the allegations in the CUTPA claim that Hanover failed to perform under the Performance Bonds prior to Intext's termination and refused to acknowledge liability under the Performance Bonds in amounts greater than those set forth in each bond. The motion is denied with respect to the remainder of the CUTPA claim. The motion is granted with respect to the allegations in the breach of contract claim concerning Hanover's failure to perform under the Performance Bonds prior to Intext's termination and its alleged authorization of disbursement of funds after Intext's default; it is denied with respect to all other parts of that claim. Finally, the motion is denied with respect to the majority of the bad faith claim, save those portions of the claim concerning Hanover's refusal to perform on the Performance Bonds prior to Intext's termination.

## II. Background

### A. Factual Background

#### 1. The Bonds

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated.

Associated Construction "entered into a guaranteed maximum price contract with Trinity Stamford Phase Two, LLC . . . to construct a residential apartment complex in Stamford, Connecticut ("the Project"). (ECF No. 153, Hanover's Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") at ¶ 1); ECF No. 176-1, Associated Construction's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") at ¶ 1.) "Intext Building Systems Inc. ("Intext") offered to enter into a single subcontract with [Associated Construction] to perform the framing and drywall related work ("Sheetrock Work") on the Project ("Original Scope"), in an amount in excess of $4,500,000." (Def.'s L.R. 56(a)1 Stmt. at ¶ 2; Pl.'s L.R. 56(a)2 Stmt. at ¶ 2 (but stating

the amount as $4,510,000).)  Associated Construction required Intext to procure payment and

performance bonds to acquire the subcontract for the Sheetrock Work on the Project.[1]  (Def.'s

L.R. 56(a)1 Stmt. at ¶ 3; Pl.'s L.R. 56(a)2 Stmt. at ¶ 3.)  To assist Intext in this endeavor,

Associated Construction introduced the company to bonding agent Woodrow Baird.  (Def.'s L.R.

56(a)1 Stmt. at ¶¶4-5; Pl.'s L.R. 56(a)2 Stmt. at ¶¶4-5.)

Baird approached Avalon, a "general managing agent for the Surety."  (Def.'s L.R.

56(a)1 Stmt. at ¶¶ 6-7; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 6-7.)  The parties diverge as to what

happened next.  Associated Construction alleges that Scott Adams, the president of Avalon,

represented that "he could not issue a single bond for an amount greater than $2,000,000 but

[that] he could issue bonds which in the aggregate [would] reach the proposed contract amount

and perform as would a single bond."  (Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 8-9.)  Hanover alleges that

Adams represented to Intext and Associated Construction only that "Avalon's discretionary

authority was limited to $2 million per bond and that Avalon lacked authority to issue a single

bond in the amount of $4,510,000."  (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 9-10.)

---

[1]  Associated Construction offers repeated blanket objections to two of the affidavits included by Hanover in support of its motion for summary judgment—affidavits by then-Vice President for Surety Claims at Hanover Joseph Brenstrom and consultant Leon Mularski—on the grounds that the affidavits constitute hearsay.  (*See, e.g.*, Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 4 (averring that "Brenstrom's Affidavit is inadmissible hearsay"), 12 (claiming that "[b]oth the Mularski and Brenstrom statements are inadmissible hearsay").)  A court has the power to "strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay, or make generalized and conclusory statements."  *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000).  Associated Construction does not provide any argument as to how the totality of Brenstrom's and Mulaski's affidavits constitute hearsay, however, particularly given their assertions at the beginning of their affidavits that that they have "first-hand knowledge of the facts set out [in the affidavit]."  (*See* ECF No. 152-2, Affidavit of Joseph Brenstrom ("Brenstrom Aff."), at ¶ 1; ECF No. 152-3, Affidavit of Leon Mularski ("Mularski Aff."), at ¶ 1.)  As such, Associated Construction's unsupported blanket objections to the admissibility of these affidavits are overruled.

Associated Construction ultimately "entered into three subcontracts which, in total, encompassed the Original Scope." (Def.'s L.R. 56(a)1 Stmt. at ¶ 11; Pl.'s L.R. 56(a)2 Stmt. at ¶ 11.) The first of these was a "subcontract with Intext in the amount of $1,987,000 to perform the interior and exterior metal stud framing ('Framing Subcontract')." (Def.'s L.R. 56(a)1 Stmt. at ¶ 12; Pl.'s L.R. 56(a)2 Stmt. at ¶ 12.)[2] Associated Construction executed the second subcontract "with Intext in the amount of $1,881,000 to perform, among other tasks, the drywall installation, fire-stopping, insulation, carpentry, and the coordination of tasks among the three subcontracts" ("Drywall Subcontract"). (Def.'s L.R. 56(a)1 Stmt. at ¶ 13; Pl.'s L.R. 56(a)2 Stmt. at ¶ 13.) Associated Construction executed the third and final subcontract in connection with the Project with IBS Systems, Inc., an entity related to Intext, "in the amount of $642,000 . . . for the purchase of drywall materials ('Materials Subcontract')." (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 14-15; Pl.'s L.R.56(a)2 Stmt. at ¶¶ 14-15.) "Three sets of payment and performance bonds ('the Bonds') were issued on November 1, 2013 in relation to the Subcontracts," each of which utilized the AIA A-311 bond form. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 16-17; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 16-17.)

The parties dispute the terms of the bonds issued in connection with the subcontracts listed above. Hanover contends that "bonds were issued in the maximum amount of $1,987,000 for the Framing Subcontract," "$1,881,000 for the Drywall Subcontract," and "$642,000 for the Materials Subcontract." (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 18-20.) Associated Construction denies that any of the bonds "have a limit in them." (Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 18-20.) While

---

[2] Associated Construction notes in its Local Rule 56(a)2 Statement that "[t]he exact scope of work [in the Framing Subcontract] is described in the exhibit" but does not otherwise dispute the veracity of Hanover's description or provide a citation refuting it. (Pl.'s L.R. 56(a)2 Stmt. at ¶ 12.) I will treat this and other unsupported statements in Associated Construction's Local Rule 56(a)2 Statement as admissions. *See* D. Conn. L. R. 56(a)3.

Hanover alleges that "[t]he [b]onds were underwritten and issued by [Avalon]" (*see* Def.'s L.R. 56(a)1 Stmt. at ¶ 21), Associated Construction contends that "[t]he bonds [were] written by Hanover and the power of attorney is attached indicating as such" (Pl.'s L.R. 56(a)2 Stmt. at ¶21). Hanover also contends that "[e]xcluding the actions and knowledge of Defendant Adams, the Surety did not have actual, prior notice of and was not involved in the underwriting or issuance of the [b]onds." (Def.'s L.R. 56(a)1 Stmt. at ¶ 23.) Associated Construction denies this contention and avers that Adams was Hanover's "general agent and as such, what he knew and did, was known and done by Hanover." (Pl.'s 56(a)2 Stmt. at ¶ 23.)

### 2. Intext's Default and Termination

In the spring of 2014, Intext began having difficulties performing under the Subcontracts. Hanover claims that Adams did not inform it of any such difficulties before June 12, 2014, and that "[t]he Surety first received actual notice of performance issues regarding the Bonds through a phone call Mr. Brenstrom received on [that date] from Mr. Thomas Walsh, who was a senior executive with [Associated Construction]." (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 24-25.) Associated Construction denies this account, averring that "Adams's knowledge is attributable to Hanover," and that Hanover received "notice when [Adams] received notice on April 8, 2014, June 2, 2014, June 6, 2014, and June 12, 2014." (Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 24-25.) Associated Construction also contends that Adams attended a May 8, 2014 meeting at its office and "made [a] direct representation to [Associated Construction] that Hanover would support Intext and help it finish the Project"; it also contends that Adams "said there was enough money available to finish the job." (Pl.'s L.R. 56(a)2 Stmt. at ¶ 116.)

Regardless of which of these accounts is correct, Hanover "commenced an investigation regarding performance and payment issues relating to the Bonds" after Brenstrom's phone call

with Walsh.  (Def.'s L.R. 56(a)1 Stmt. at ¶ 27; Pl.'s L.R. 56(a)2 Stmt. at ¶ 27.)  Hanover

contends that it "initially ascertained that Intext/IBS and Defendant [Lighthouse] had entered

into a Disbursement Control Agreement ("DCA") regarding the Subcontracts."  (Def.'s L.R.

56(a)1 Stmt. at ¶ 29.)  Associated Construction contends that Hanover "knew or should have

[already] known" this information given that Adams was in charge of "funds control" for the

Bonds.  (Pl.'s L.R. 56(a)2 Stmt. at ¶ 29.)

Although the parties dispute the exact details, Associated Construction hired

subcontractors to help supplement Intext's work at some point during this period.  (*See* Def.'s

L.R. 56(a)1 Stmt. at ¶ 38; Pl.'s L.R. 56(a)2 Stmt. at ¶ 38.)  Hanover alleges that it "initially

became aware that [Associated Construction] was supplementing Intext's Labor on the Project

with other subcontractors through its receipt of [various letters on June 13, 2014]."  (Def.'s L.R.

56(a)1 Stmt. at ¶¶ 33-34.)  Associated Construction denies this proposition on the basis that it

had sent notice to Adams earlier and that Adams's knowledge is imputable to Hanover.  (Pl.'s

L.R. 56(a)2 Stmt. at ¶¶ 33-34.)  Hanover also consented to an advance of $213,666.72 to Intext

in advance of these funds being earned under the Subcontracts.  (*See* Def.'s L.R. 56(a)1 Stmt. at

¶¶ 39-40 (noting that Hanover consented to the advance; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 39-40

(contending that Hanover did not have any right to object to the advance).)  Hanover consented

to several further advances both to Intext and to Intext's subcontractors.  (*See* Def.'s L.R. 56(a)1

Stmt. at ¶¶ 41-42, 44; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 41-42, 44 (agreeing that Hanover consented to

the advances but contending it had no right to object to them in any event).)  On July 14, 2018,

Associated Construction 'issued termination notices to Intext and IBS . . ., one relating to the

Framing and Drywall Subcontracts and the other to the Materials Subcontract, with the

terminations of the Subcontracts effective as of July 15, 2014." (Def.'s L.R. 56(a)1 Stmt. at ¶ 45; Pl.'s L.R. 56(a)2 Stmt. at ¶ 45.)

### 3. Subsequent Events

Following the "Intext/IBS termination, [Associated Construction] made multiple requests to the Surety for permission to pay amounts owed to the supplementing contractors from the undisbursed subcontract balances." (Def.'s L.R. 56(a)1 Stmt. at ¶ 48; Pl.'s L.R. 56(a)2 Stmt. at ¶ 48.) Hanover "consented to each of the[se] requests . . . and waived its defenses to such payments." (Def.'s L.R. 56(a)1 Stmt. at ¶ 49; Pl.'s L.R. 56(a)2 Stmt. at ¶ 49.) At some point in July 2014, the Surety "advised [Associated Construction] that its completion obligations under the Performance Bonds were triggered by the bonded subcontractors being terminated." (Def.'s L.R. 56(a)1 Stmt. at ¶ 51 (averring that this occurred "no later than the end of July 2014"); Pl.'s L.R. 56(a)2 Stmt. at ¶ 51 (noting that the "Surety states it had this information by July 7, 2014").) At this point, the parties' accounts once again differ. Hanover claims that "[b]y no later than the end of July 2014, the Surety had advised [Associated Construction] that its completion options under the Performance Bonds included a right to pay [Associated Construction] for its completion costs incurred as a result of the Intext terminations in excess of the undisbursed contract balances under each subcontract." (Def.'s L.R. 56(a)1 Stmt. at ¶ 52.) Hanover also claims that it informed Associated Construction during this same timeframe "that the Performance Bonds were separate legal obligations, each with a separate maximum exposure amount." (Def.'s L.R. 56(a)1 Stmt. at ¶ 54.) Associated Construction denies both of these contentions. (Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 52, 54.)

"Beginning in July 2014, the Surety began advising [Associated Construction] that in order to determine whether amounts were owed under each of the Performance Bonds and, if so,

how much was owed under each Bond, the Surety needed to determine the undisbursed subcontract balance under each of the Subcontracts and allocate [Associated Construction's] alleged completion costs among each of the three Subcontracts and three Performance Bond Claims." (Def.'s L.R. 56(a)1 Stmt. at ¶ 55; Pl.'s L.R. 56(a)2 Stmt. at ¶ 55.) In early July, Hanover "advised [Associated Construction] to allocate all of its costs claimed against the Surety (and contract funds disbursed) on a per Subcontract and per Bond basis so that the Surety could determine its exposure under each Bond . . . ." (*See* Def.'s L.R. 56(a)1 Stmt. at ¶ 56; Pl.'s L.R. 56(a)2 Stmt. at ¶ 56 (admitting everything but the date).)

Over the next few months, Hanover requested "documentation and information in order to allocate among the Subcontracts the construction costs claimed by [Associated Construction] and the amounts of the undisbursed Subcontract balances under each Subcontract." (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 56, 58; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 56, 58.) In early September 2014, Associated Construction "initially transmitted to the Surety an allocation by Subcontract of actual construction costs incurred post termination and claimed under the Bonds." (Def.'s L.R. 56(a)1 Stmt. at ¶ 60; Pl.'s L.R. 56(a)2 Stmt. at ¶ 60.) Despite these disclosures, Hanover's consultant, Leon Mularski, informed the company that "the documentation needed to evaluate the allocations of costs as well as to accurately determine the Subcontract balances had not been sufficiently disclosed." (Def.'s L.R. 56(a)1 Stmt. at ¶ 61; Pl.'s L.R. 56(a)2 Stmt. at ¶ 61.)[3]

In August 2014, "the Surety offered to [Associated Construction] to take over and complete areas of the framing work that were not already being worked on by [Associated Construction's] supplementing subcontractors and pay the excess completion costs for

---

[3] Associated Construction denies the accuracy of these statements but does not deny that they were made. (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 61 ("Admitted that Consultant made the statements. Deny that the statements are accurate.").)

[Associated Construction's] supplementing contractors that were performing the work under the Drywall Subcontract . . . ." (Def.'s L.R. 56(a)1 Stmt. at ¶ 62; Pl.'s L.R. 56(a)2 Stmt. at ¶ 62.) Associated Construction "rejected the Surety's takeover proposal because it did not believe that the proposed completion contractor was competent to complete the framing work included within the Surety's proposed scope." (Def.'s L.R. 56(a)1 Stmt. at ¶ 66; Pl.'s L.R. 56(a)2 Stmt. at ¶ 66.)

In October 2014, the parties arrived at different understandings of the amounts Hanover owed on the Bonds. After a meeting occurring on October 10, 2014 between representatives of the parties, Mularski "advised the Surety that he was initially able to allocate construction costs and finalize undisbursed contract balances with a reasonable degree of accuracy and to understand how his analysis differed from the allocations assigned by [Associated Construction]." (Def.'s L.R. 56(a)1 Stmt. at ¶ 70; Pl.'s L.R. 56(a)2 Stmt. at ¶ 70.) Hanover sent Mularski's analysis to Associated Construction on October 14, 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶ 73; Pl.'s L.R. 56(a)2 Stmt. at ¶ 73.)

At a meeting that took place between the Surety and Associated Construction on October 15, 2014, the parties came to an agreement whereby the Surety would pay Associated Construction $1,881,000 "representing what the Surety believes is the final payment for all claims under the Drywall Performance Bond" and "$475,733.17 in regard to [Associated Construction's] claim under the Framing Performance Bonds." (*See* Brenstrom Aff., Ex. 21 at 1-2; Def.'s L.R. 56(a)1 Stmt. at ¶ 79 (referring to this agreement as the memorialization of the parties' terms); Pl.'s L.R. 56(a)2 Stmt. at ¶ 79 (same).) Although the parties' agreement memorialized these terms, it also noted that Associated Construction "reserves all of its rights, claims and defenses as to claims for additional sums under the [Framing Bond], the [Drywall

Bond] and the [Materials Bond][,] as well as claims for additional sums relating to the Framing, Drywall and Materials Subcontracts (including but not limited to claims for extra-contractual damages and claims that in effect, the subcontract is one agreement or there are no limits on the amount the Surety is liable for under each or any bond)." (Brenstrom. Aff., Ex. 21 at 3.)

## B. Associated Construction's Complaint Against Hanover

As a result of the events listed above, Associated Construction brought four claims against Hanover: (i) a breach of contract claim predicated upon Hanover's alleged breach of the "Performance Bonds' terms," along with the disbursement control agreements ("DCAs") regulating the disbursement of funds to Intext (ECF No. 43 ("Complaint") at ¶¶ 44-59); (ii) a CUTPA claim based upon all of the conduct listed above (*id.* at ¶¶ 60-69); (iii) a bad faith claim predicated upon Adams's alleged misrepresentations and Hanover's failure to perform under the Bonds (*id.* at ¶¶ 70-82); and (iv) a CUIPA claim that in effect mirrors the CUTPA claim (*id.* at ¶¶ 83-90). Associated Construction's complaint focuses on three general areas of conduct. First, it contends that Adams, acting as an agent of Hanover, made a misrepresentation at an October 9, 2013 meeting with Associated Construction that the three Performance Bonds would act the same as one bond. (*See, e.g.*, *id.* at ¶ 62(g).) Second, it alleges that Adams, once again acting as an agent for Hanover, misrepresented at a May 8, 2014 meeting with Associated Construction that Hanover would support Intext and enable it to complete the Sheetrock Work on schedule, and that there were adequate funds to complete the Project. (*See, e.g.*, *id.* at ¶ 62(j-k).) Finally, Associated Construction contends that Hanover failed to perform under the Performance Bonds after Intext defaulted. (*See, e.g.*, *id.* at ¶ 62(a-f, k-o).)

## III. Standard of Review

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

## IV. Discussion

### A. CUIPA Claim (Count Four)

Associated Construction has agreed to withdraw its CUIPA claim. (*See* ECF No. 176 at 19.) I therefore grant Hanover's motion for summary judgment with respect to Count Four.

### B. CUTPA Claim (Count Two)

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). In determining whether a practice violates CUTPA, a court must consider three criteria:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] . . .

*Ulbrich v. Groth*, 310 Conn. 375, 409 (2013) (quoting *Harris v. Bradley Memorial Hospital & Health Center, Inc.,* 296 Conn. 315, 350-51 (2010)). A practice may violate CUTPA without meeting all three criteria—i.e. a practice "may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . ." *Id.* "Whether a practice is unfair and thus violates CUTPA is an issue of fact." *Milso Industries Corp.*, 2012 WL 3778978 at *14 (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 434 (2004)). Hanover makes a number of arguments attacking various portions of Associated Construction's CUTPA claims. I analyze each of these arguments below.

### 1. Hanover's Obligation to Perform Prior to Termination of Intext

Hanover contends that a portion of Associated Construction's CUTPA claim fails because Hanover's obligation to perform under the Bonds was triggered only by the termination of the bond principal, Intext. (ECF No. 152 at 20 (citing Complaint at ¶¶ 62(a) ("Hanover repeatedly refused to respond or take action as required by the Performance Bonds after [Associated Construction] declared Intext in default"), 62(b) ("Hanover asserted it had no obligation to perform unless and until Intext was terminated"); 62(c) ("Hanover continually refused to perform under the terms of the performance bonds even after Intext was terminated")).) The portion of the Performance Bonds disputed by the parties states, in relevant part, as follows:

> Whenever [Intext] shall be, and declared by [Associated Construction] to be in default under the contract, [Associated Construction] having performed [its] obligations thereunder, [Hanover] may promptly remedy the default, or shall promptly [perform various other actions].

(Brenstrom Aff., Ex. 8 ("Framing Bond") at 2; Brenstrom Aff., Ex. 9 ("Drywall Bond") at 2; Brenstrom Aff., Ex. 10 ("Materials Bond") at 2.) Hanover contends that it acted in accordance

with Second Circuit law in declining to perform under the Bonds until Associated Construction formally terminated Intext under the Bond. (ECF No. 152 at 20.) I agree.

The Second Circuit's decision in *Elm Haven Const. Ltd. Partnership v. Neri Const., LLC*, 376 F.3d 96 (2d Cir. 2004), controls this case. *Elm Haven* concerned, as a matter of Connecticut law, whether a surety's obligations under a performance bond could be triggered prior to the obligee's termination of the principal under the bond. *Id.* at 98. The bond in question contained nearly identical language to the Bonds at issue in this case. *See id.* at 98 (the bond stated that: "Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder: (1) Surety may promptly remedy the default . . . or [perform various other actions]"). In analyzing this provision, the *Elm Haven* court noted as follows: "In order to trigger [the Surety's] liability under the Performance Bond, two conditions had to be met. First, [the Principal] had to be 'in default' under the subcontract agreement, and second, [the Obligee] had to 'declare[] [the Principal] to be in default under the' subcontract agreement." *Id.* at 100.

This declaration of default, the *Elm Haven* court noted, "had to be made to [the Surety] in precise terms." *Id.* (citing *L & A Contracting Co.*, 17 F.3d 106, 111 (5th Cir. 1994) ("A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond.")). The Second Circuit noted specifically that "[i]f [the Obligee] wanted to trigger the Performance Bond . . . , it would have had to terminate its relationship with [the Principal]." *Id.* at 101. Here, Associated Construction did

not terminate its relationship with Intext until July 14, 2018. (Def.'s L.R. 56(a)1 Stmt. at ¶ 45; Pl.'s L.R. 56(a)2 Stmt. at ¶ 45.) As such, Hanover did not have an obligation to perform under the Bonds until that point.

Associated Construction points to a Washington Supreme Court case that it contends disagrees with the reasoning of the *Elm Haven* court. (*See* ECF No. 176 at 22 (citing *Colorado Structures, Inc. v. Insurance Co. of the West*, 161 Wash. 2d 577 (2007).) That case is irrelevant, however, given that Second Circuit precedent is binding upon this court. *In re S. African Apartheid Litig.*, 15 F. Supp. 3d 454, 459 (S.D.N.Y. 2014) ("Lower courts are bound by Second Circuit precedent unless it is expressly or implicitly overruled by the Supreme Court or an en banc panel of the Second Circuit." (internal quotation marks omitted)); *Euro Tr. Trading S.A. v. Uralsib Ins. Grp.*, No. 09 CIV. 4712 (RJH), 2009 WL 5103217, at *1 (S.D.N.Y. Dec. 23, 2009) ("Even on issues of state law, the Court is bound by Second Circuit precedent."). Associated Construction also appears to contend that the Washington Supreme Court case is more apposite because it expressly interpreted the "AIA 311 bond form." (*See* ECF No. 176 at 22.) This argument is meritless, however, given the nearly identical language analyzed by the *Elm Haven* court.

Hanover is therefore entitled to judgment as a matter of law on those portions of Associated Construction's CUTPA claim alleging that Hanover violated the statute by declining to perform under the bonds before Intext's termination—i.e., the allegations contained in paragraphs 62(a) and 62(b) of Associated Construction's complaint. Hanover is not entitled to summary judgment with respect to the allegations contained in paragraph 62(c) of the complaint, however, which concern Hanover's performance under the Bonds after Intext's termination.

(*See* Complaint at ¶ 62(c) ("Hanover continually refused to perform under the terms of the performance bonds even after Intext was terminated.").)

## 2. Evidence of a General Business Pattern of Impermissible Conduct

Hanover contends that the portions of Associated Construction's CUTPA claim based upon allegations of unfair claims settlement practices in violation of CUIPA fail because they do not allege that any such acts were committed with enough frequency to indicate a general practice. (ECF No. 176 at 18.) CUIPA provides, in relevant part, that "[n]o person shall engage in this state in any trade practice which is defined in [Conn. Gen. Stat. § 38a-816] as . . . an unfair method of competition or an unfair or deceptive act or practice in the business of insurance . . . ." Conn. Gen. Stat. § 38a-815. The statute sets out a number of definitions of unfair practices, including the following:

> (1) Misrepresentations and false advertising of insurance policies. Making, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison which: (A) Misrepresents the benefits, advantages, conditions or terms of any insurance policy . . .
>
> . . .
>
> (6) Committing or performing with such frequency as to indicate a general business practice any of the following: (A) Misrepresenting pertinent facts or insurance policy provisions to coverages at issue; (B) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; . . . (F) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; . . . [and] (N) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement . . . .

*Id.* The Connecticut Supreme Court has held "that a CUTPA claim based on an alleged unfair claim settlement practice prohibited by § 38a-816(6) require[s] proof, as under CUIPA, that the unfair settlement practice ha[s] been committed or performed by the defendant 'with such

15

frequency as to indicate a general business practice.'" *Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 850 (1994) (quoting Conn. Gen. Stat. § 38a-816(6)). Although there is no "magic number of other instances [of an unfair settlement practice] that a plaintiff must allege" to set out a viable CUTPA claim based upon a CUIPA violation, *see Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 166 (D. Conn. 2014), the term "instances" suggests that the number must be greater than one. *See Lees*, 229 Conn. at 849 (noting that "the legislature has manifested a clear intent to exempt from coverage under CUIPA isolated instances of insurer misconduct").

Hanover alleges that much of Associated Construction's CUTPA claim fails because it is based upon violations of § 38a-816(6) of CUIPA and fails to allege any other instances of unfair conduct. (ECF No. 152 at 18.) As such, Hanover seeks summary judgment on Associated Construction's CUTPA claim. (*See id.* (citing Complaint at ¶¶ 62(c-m)).) In my ruling on the defendants' motions to dismiss (ECF No. 103 ("MTD Ruling")), however, I rejected a similar argument brought by Lighthouse, finding that Associated Construction's allegations fell under Section 816(1) of CUIPA, which does not require proof of a "general business practice." (*See* MTD Ruling at 14 n. 11, 16 (rejecting argument that Associated Construction had to make allegations about "general business practices" to set out a viable CUTPA claim based on CUIPA violation against given that portion of Associated Construction's allegations fell under Section 816(1) of CUIPA).) Given that disposition, I reject Hanover's argument that the portion of the CUTPA claim alleging misrepresentations fails due to the absence of allegations concerning a "general business practice." (*See* Complaint at ¶ 65(e-f) (alleging that Hanover made various misrepresentations about the nature of the Performance Bonds), 65(j) (averring that the Adams Defendants made misrepresentations to Associated Construction).)

The remaining portions of Associated Construction's CUTPA claim assailed by Hanover under this theory present a closer question. Hanover's alleged refusal to perform under the terms of the Performance Bonds after Intext's termination and offer to partially perform in exchange for a release of its remaining obligations under the bonds (*see* Complaint at ¶ 65(c-d)) does not fit comfortably within the parameters of Section 816(1)'s prohibition against misrepresentations. That does not mean, however, that it necessarily falls only under Section 816(6) of CUIPA, and Hanover has not shown that it does. Rather, these allegations hew more closely to a breach of contract allegation. In any event, they are not so tethered to Section 816(6) as to warrant their dismissal as a matter of law based on a failure to satisfy the requirements of that provision, and Hanover makes no other argument against the claim.

### 3. Hanover's Obligations Under the Performance Bonds

Hanover makes a series of arguments based upon its interpretation of its obligations under the Performance Bonds. In particular, it contends that each Performance Bond covers a distinct scope of work and caps its exposure, and that its completion options under each Bond included reimbursing Associated Construction up to each Bond's maximum exposure. (ECF No. 152 at 22-31.) As such, it moves for summary judgment with respect to the portions of Associated Construction's CUTPA claim it contends concern an improper understanding of Hanover's obligations under the Bonds. (*See id.* (citing Complaint at ¶ 62 (e, f, g, i).)

The Performance Bonds at issue in this case spell out the parties' obligations. Each Bond contains the following passage addressing Hanover's liability under the Bonds:

> Know all men by these presents: that [Intext] as Principal . . . and, [Hanover] as Surety . . . are held and firmly bound unto [Associated Construction] as Obligee . . . in the amount of [$1,987,000.00, in the case of the Framing Bond] for the payment whereof [Intext] and [Hanover] bind themselves . . . jointly and severally, firmly by these presents.

. . .

> Whenever [Intext] shall be, and declared by [Associated Construction] to be in default under the Contract, [Associated Construction] having performed [Associated Construction's] obligations thereunder, the Surety may promptly remedy the default, or shall promptly
>
> 1) Complete the Contract in accordance with its terms and conditions, or
>
> 2) Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or, if [Associated Construction] elects, upon determination by [Associated Construction] and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and [Associated Construction], and make available as Work progresses [even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the contract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by [Associated Construction] to [Intext] under the Contract and any amendments thereto, less the amount properly paid by [Associated Construction] to [Intext].

(Framing Bond at 2; Drywall Bond at 2; Materials Bond at 2.)  The passage above makes clear that Hanover is liable under the Performance Bonds only to the extent of the amount set by the Bonds, which expressly state that Hanover "binds [itself]" "for the payment" of the amount of the Bond, i.e., $1,987,000.00 in the case of the Framing Bond, and that the amount Hanover pays may not "exceed[], *including other costs and damages for which the Surety may be liable hereunder*, the [amount of the Bond]."  (*Id.* (emphasis added).)  Thus, Hanover is correct in arguing that its liability under the Performance Bonds is capped by the amount set forth in the bonds.

Associated Construction disputes this conclusion on the basis that "each bond says that Hanover is bound 'jointly and severally' to [Associated Construction] just as Intext or its affiliate has been to the Subcontract."  (ECF No. 176 at 24.)  While this is correct, it does not aid

Associated Construction's attempt to escape the limit on the Surety's exposure. The reference to joint and several liability in the Performance Bonds refers to the fact that the contractor and surety—here, Intext and Hanover—are jointly and severally liable *for the amount listed in the performance bond*. (*See* Framing Bond at 2 (noting that "[Intext] and Surety bind themselves . . . jointly and severally" "for the payment" of the bond amount).)

Associated Construction also argues that Adams's alleged misrepresentation at the October 2013 meeting that the three Performance Bonds would act as one constitutes a separate oral agreement that affects the operation of the Bonds. (ECF No. 176 at 28.) As an alternative interpretation of the Bonds, this argument is foreclosed by the parol evidence rule. The "parol evidence rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing." *Alstom Power, Inc. v. Balcke-Durr, Inc.*, 269 Conn. 599, 609 (2004) (internal quotation marks omitted). The rule "forbid[s] the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract . . . to vary or contradict the terms of such a contract." *Id.*; *see also* 11 Williston on Contracts § 33:1 (4th ed.) ("The parol evidence rule is a substantive rule of law that prohibits the admission of evidence of prior or contemporaneous oral agreements, or prior written agreements, whose effect is to add to, vary, modify, or contradict the terms of a writing which the parties intend to be a final, complete, and exclusive statement of their agreement.").

The first inquiry in determining the application of the parol evidence rule concerns whether the written agreement in question is "integrated"—i.e., whether the writing is intended

as "a final expression of one or more terms of an agreement." *Associated Catalog Merchandisers, Inc. v. Chagnon*, 210 Conn. 734, 740 (1989) (quoting Restatement (Second) of Contracts § 209 (1981)). A court may determine whether a writing "is integrated and operates to exclude evidence of the alleged extrinsic negotiation if the subject matter of the latter is mentioned, covered or dealt with in the writing . . .; if it is not, then probably the writing was not intended to embody that element . . . ." (*Id.* (internal quotation marks omitted)). Here, Hanover's liability under the Performance Bonds is clearly "mentioned, covered or dealt with" in the Bonds. As noted above, the Bonds provide that Hanover's liability is not to "exceed . . . the amount set forth in the first paragraph" of the Bonds. (*See* Framing Bond at 2; Drywall Bond at 2; Materials Bond at 2.) The Performance Bonds are therefore integrated with respect to Hanover's liability, and the parol evidence rule applies. *See Stevens v. Landmark Partners, Inc.*, No. 3:09-CV-00498 (WWE), 2012 WL 13026652, at *5 (D. Conn. July 27, 2012) (concluding that agreement's mentioning of subject precluded introduction of parol evidence on that subject).

As a result, in interpreting the Performance Bonds, I may not consider any parol evidence that varies or contradicts the Bonds' caps on the Surety's exposure. Given that Associated Construction's allegations of an oral agreement with Adams would directly contradict the language of the Performance Bonds, I conclude that the parol evidence rule bars me from considering them to interpret the Bonds. *See Giorgio v. Nukem, Inc.*, 31 Conn. App. 169, 175 (1993) (noting that "the parol evidence rule renders inoperative prior written agreements as well as prior oral agreements" (internal quotation marks omitted)); *Gibilisco v. Wells Fargo Bank, N.A.*, No. 3:14-CV-00294 JAM, 2015 WL 2383746, at *1 (D. Conn. May 19, 2015) ("The parol evidence rule generally forbids proof of an oral agreement when used to vary or contradict the terms of a later agreement that has been set forth by the parties in writing.").

Therefore, I grant Hanover summary judgment as to the portions of Associated Construction's CUTPA claim that fault Hanover for telling Associated Construction that each bond had to be considered separately and that its exposure with respect to each scope of work was capped by the amount stated in each bond. (*See* Complaint at ¶ 62(e) ("Hanover insisted that [Associated Construction] break down and reconcile the cost according to the work described in the three bonds, and argued that the exposure was limited by the amount stated in each bond, relative to the work described in each bond."), 62(f) ("Hanover insisted the Performance bonds were penal sum bonds and therefore the total exposure was the amount of each bond.").) I do not grant Hanover summary judgment, however, with respect to its alleged misrepresentations (through its alleged agent, Adams) made at the October 9, 2013 meeting about how the Bonds would function. While those alleged misrepresentations may not be used to vary or contradict the language of the Bonds, they may be independently actionable as false inducements to enter into the Bonds under Section 816(1) of CUIPA, as discussed above. *See Foley v. Huntington Co.*, 42 Conn. App. 712, 721-22 (1996) (holding that alleged negligent misrepresentation that induced buyer to enter into contract was actionable despite subsequent fully integrated contract); *Warman v. Delaney*, 148 Conn. 469, 474 (1961) (upholding material misrepresentation claim based upon oral representation that induced party to enter into contract despite fact that subsequent contract was fully integrated).[4]

---

[4] While there are Connecticut cases holding that a party could not reasonably rely upon an oral misrepresentation made prior to a contract, these cases involve contracts containing language that explicitly disclaims prior representations. *See, e.g.*, *Gibson v. Capano*, 241 Conn. 725, 727-28, 734 (1997) (upholding directed verdict in favor of defendants on claim concerning oral representations regarding status of house where plaintiffs entered into subsequent real estate contract disclaiming reliance on prior representations made by defendants—to wit, "neither the Seller, nor any representative of the seller has made any representation upon which the Buyer relies with respect to the condition of the property covered in this agreement, except as hereinbefore expressly set forth . . . . [N]o oral statements or promises and no understanding not

Associated Construction's argument that Hanover failed to perform under the Bonds, however, stands on a different footing, as the language of the Bonds does not clearly resolve the issue. (ECF No. 176 at 24 (claiming that Hanover failed to go "into the market and [find] a completing contract or willing to's [sic] perform the work on a lump sum basis").)  Associated Construction also contends that Hanover failed to perform under the Bonds "promptly."  (*See id.* at 26 (citing Framing Bond at 2 (noting that Surety must carry out obligations "promptly" in event of principal's default); Drywall Bond at 2 (same); Materials Bond at 2 (same)).)  Hanover contends that it acted in accordance with the Performance Bonds by letting Associated Construction's subcontractors finish the Sheetrock Work and then paying Associated Construction the difference between its completion costs and the "balance of the contract[s]" up to the limits of the Performance Bonds.  (*See* ECF No. 185 at 3-4.)

This issue rests upon a disputed issue of material fact—to wit, whether Hanover's apparent de facto ratification of Associated Construction's hiring of subcontractors to finish the Sheetrock Work met its obligations under the Performance Bond.  (*Contrast* Def.'s L.R. 56(a)1 Stmt. at ¶¶ 52-53 (averring that Hanover advised Associated Construction in July 2014 "that its completion options under the Performance Bonds included a right to pay [Associated Construction] for its completion costs incurred as a result of the Intext terminations in excess of the undisbursed contract balances under each Subcontract" and that Hanover "was advised by

_____

embodied in this Contract shall be in effect"); *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169, 197 (2013) (concluding defendant entitled to judgment on negligent misrepresentation claim that concerned two oral representations made before execution of contract containing merger clause: "The language of the merger clause made it clear to the plaintiff that VitalWorks did not intend to be bound by any representation made prior to the contract being signed and, therefore, reliance by the plaintiff on any such representation would not have been reasonable.").  Hanover points to no such language in the pertinent agreements here.

[Mularski] that the most expeditious approach to completing the Intext/IBS scope was for [Associated Construction] to continue to deploy its supplementing contractors to complete that work") *with* Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 52-53 (denying both of those contentions and arguing that "[i]n any event, whether the information was passed to the Surety or not, Hanover made no attempt to find a completing contractor that would perform all the work for a lump sum price").)

As noted previously, the Bonds provide Hanover three options in the event of a declaration of default: (1) "promptly remedy the default" (Framing Bond at 2; Drywall Bond at 2; Materials Bond at 2); (2) "[c]omplete the Contract in accordance with its terms and conditions" (*id.*); or (3) "[o]btain a bid or bids for completing the contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or if [Associated Construction] elects, upon determination by [Associated Construction] and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and [Associated Construction], and make available as work progresses . . . sufficient funds to pay the cost of completion less the balance of the contract price . . . ." (*Id.*) Hanover clearly did not elect the second option, and there is no evidence that it obtained bids in accordance with the third option. It remains ambiguous whether it substantially performed under either the first or third options by coordinating with Associated Construction to enable its subcontractors to complete the project. The Bond does not specify, for example, how the Surety is to "remedy the default," and there is some evidence that Hanover sought to "make available as Work progresses . . . sufficient funds to pay the cost of completion less the balance of the contract price." (Framing Bond at 2, Drywall Bond at 2, Materials Bond at 2; *see also* ECF No. No. 152-2 at ¶¶ 47-49.) In short, it is not clear whether what Hanover did conforms to the parties' intent under the first or third options. This issue remains for a jury to decide.

In sum, I conclude that Hanover has established as a matter of law that its liability under the Performance Bonds is capped by the amount of the Bonds. As such, it is entitled to summary judgment with respect the parts of the CUTPA claim alleging that it so informed Associated Construction. I reject Hanover's argument with respect to the remainder of the CUTPA claim.

### 4. Associated Construction's Standing

Hanover contends that Associated Construction lacks standing to allege a breach of the DCAs in this case and that it did not suffer a loss as a result of any such breach. (ECF No. 152 at 31.) In particular, it assails the portions of Associated Construction's CUTPA claim alleging that Lighthouse—acting with the tacit consent of Hanover—made false representations to Associated Construction concerning whether there were adequate funds in "the funds control account" to complete the Project and "disbursed funds from the funds control account when it knew or should have known that there were not enough funds available considering the balance to be paid under the Subcontract to complete the Sheetrock Work." (Complaint at ¶ 62(k-m).) Hanover's argument is apparently premised on a misreading of my earlier ruling on the motion to dismiss. In that ruling, I dismissed Associated Construction's breach of contract claim against Lighthouse on the basis that Associated Construction "was neither a party nor a third-party beneficiary under the DCAs." (*See* MTD Ruling at 10.) Hanover cites this passage in support of its proposition that Associated Construction's CUTPA claim, which is premised upon similar allegations, also fails. (*See* ECF No. 152 at 31 (citing MTD Ruling at 10-14).)

My ruling on the adequacy of Associated Construction's breach of contract claim against Lighthouse differed, however, from my conclusion on the adequacy of its CUTPA claim. I concluded with respect to the latter that "Associated Construction ha[d] plausibly stated a [CUTPA] claim against Lighthouse" on the basis of common law negligent misrepresentation.

(*See* MTD Ruling at 14-15.)  I further noted that Associated Construction had adequately alleged that it had "suffered pecuniary harm [in its CUTPA claim], specifically, that it made advance payments to Intext based on Lighthouse's representations at the May 8 meeting."  (*See id.* at 15 (citing Complaint at ¶ 75).)  This reasoning demonstrates the flaw in Hanover's argument— Associated Construction's CUTPA claim differs in kind from its breach of contract claim.  While the latter claim rests upon the DCAs, the former claim rests upon a claim of misrepresentation under CUTPA.  Thus, Hanover's contention that Associated Construction lacks standing to pursue its CUTPA claim against Hanover based upon Lighthouse's conduct rests upon faulty premises.

Hanover also contends that Associated Construction could not have been harmed by Lighthouse's decision to disburse further funds to Intext given that "the Surety approved the release of contract funds to Intext . . . at the express request and the direction of [Associated Construction] which advised the Surety that it sought the release of funds to Intext in order to advance the progress of the work on the job."  (ECF No. 152 at 32.)  This argument misses a fundamental part of Associated Construction's complaint.  Associated Construction alleges that Hanover allowed Lighthouse to disburse funds when Intext was in default "when [Hanover] knew or should have known that Intext could not complete the Project for the funds available." (*See* Complaint at ¶ 62(m).)  The implication of this allegation is that Associated Construction was unaware of this shortfall when it approved the disbursements.  Thus, even if Associated Construction specifically approved each disbursement of funds, its allegations suggest that it did so because it was misled by Hanover and Lighthouse.  As such, Hanover's argument that it was acting in accordance with Associated Construction's demands does not defeat Associated Construction's claim based on the disbursements.

Finally, Hanover's contention that Associated Construction could not have suffered damages from Lighthouse's continued disbursal of funds is a nonstarter. Hanover argues that Associated Construction could not have suffered harm from Lighthouse's continued provision of funds to Intext because all of these advances "flowed through and were properly applied to Project-related expenses by Lighthouse." (ECF No. 152 at 32.) This argument relies upon the supposition that Intext's continued work on the Project as it drifted into default was competent, an assertion that Associated Construction denies in its complaint and rebuts with evidence. (*See* Complaint at ¶ 34 (noting that Intext fell further behind schedule after May 8, 2014); Walsh Aff., ECF No. 176-5 at ¶ 68).) Thus, Associated Construction effectively alleges that it relied upon Lighthouse's misrepresentations in chasing good money after bad in continuing to fund Intext rather than hiring a new subcontractor. The parties' dispute over the quality of Intext's work compared to that of a hypothetical replacement contractor presents a genuine issue of material fact.

I therefore reject Hanover's contention that Associated Construction lacks standing to pursue a portion of its CUTPA claim.

### C. Bad Faith Claim (Count Three)

I construe Associated Construction's "Bad Faith" claim as a claim for breach of the covenant of good faith and fair dealing. *See Lincoln Gen. Ins. Co. v. Rodriguez,* No. CV085007513, 2010 WL 5064463, at *3 (Conn. Super. Ct. Nov. 17, 2010) (construing "Bad Faith" claim as a claim for breach of the covenant of good faith and fair dealing). "[T]he duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 295 (D. Conn. 2017) (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004)). This duty "requir[es] that

neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Id.* To set out "a cognizable claim of breach of the implied covenant of good faith and fair dealing, [the plaintiff must allege that] 'the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract [were] taken in bad faith.'" *Calhoun v. Providence Mut. Fire Ins. Co.*, 204 F. Supp. 3d 436, 442 (D. Conn. 2016) (quoting *De La Concha of Hartford, Inc.*, 269 Conn. at 433). Bad faith encompasses "both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Habetz v. Condon*, 224 Conn. 231, 237 (1992), quoting Black's Law dictionary (5th ed. 1979). In essence, then, "[bad] faith means more than mere negligence; it involves a dishonest purpose." *De La Concha of Hartford, Inc.*, 269 Conn. at 433.

Associated Construction's bad faith claim avers that the Surety "failed and/or refused to perform" under the Performance Bonds. (Complaint at ¶ 74.) The claim reiterates the allegations concerning Adams's alleged misrepresentation regarding Intext's capacity to finish the Sheetrock Work on May 8, 2014, along with Hanover's alleged failure to perform its obligations under the Bonds after Intext's default. (*See* Complaint at ¶¶ 75-78.) Hanover advances two arguments against this claim. First, it reiterates all of its prior arguments that it performed its obligations under the Bonds. (*See* ECF No. 152 at 33-34.) Second, it contends that there is no evidence that it acted with malice. (*See id.* at 34.) The first argument succeeds to the same extent it did against Associated Construction's CUTPA claim. Hence, Associated Construction is foreclosed from arguing that Hanover's refusal to perform under the Bonds prior to the termination of Intext or its insistence that its liability was capped under each bond

constitutes bad faith. This has little bearing on the lion's share of Associated Construction's bad faith claim, however, which mainly dwells upon Adams's alleged misrepresentations concerning Intext's financial health and Hanover's performance of its obligations under the Bonds themselves.

Hanover's contention that there is no evidence of malice also lacks merit. Associated Construction has presented several pieces of evidence that, when all inferences are drawn in its favor, establish a genuine issue of material fact concerning whether Hanover acted with "a dishonest purpose." *See De La Concha of Hartford, Inc.*, 269 Conn. at 433. The first of these is a memorandum dated July 7, 2014, from Hanover executive James Pete to Hanover president Robert Thomas noting that the company had conducted an audit in early 2013 of its affiliation with Avalon and determined that it could have terminated Avalon "for cause as a result of the violations noted in the . . . audit." (ECF No. 176-4, Exhibit 58, at 1.) The same memorandum also noted that Hanover had decided to terminate Avalon in part due to these violations effective December 31, 2013. (*Id.*) Finally, the memorandum noted that Hanover had been more lenient towards Avalon—i.e., not terminated it for cause—due to the fact that "Avalon had been largely profitable to Hanover and our closure of [Hanover's affiliation with it] was not in retaliation for the overreach of authority or failure to comply with the terms and conditions." (*Id.*) Drawing all inferences in Associated Construction's favor, a reasonable juror could find that this memorandum shows that Hanover was fully aware of Avalon's—and by extension Adams's—willingness to play fast and loose with its accounts, but nonetheless allowed it to continue representing the Surety because it was profitable. Following this train of logic to its endpoint, a reasonable juror could conclude that Adams's May 8, 2014 misrepresentation was a direct result

of Hanover's willingness to overlook Adams's misconduct due to the profits he brought to the Surety.

This understanding is supported by another memorandum in the record—this one from Hanover executive Peter Quinn to Thomas. (ECF No. 176-4, Exhibit 83, at 1.) In this memorandum, dated August 13, 2013, Quinn discusses Hanover's difficult relationship with Avalon and notes as follows:

> Once again, we are at a cross roads with the Avalon program. The results to date have been phenomenal, however I am also smart enough to know when to get off the wave before it crashes. I struggle with the idea of giving up $1-1.5 mm in premium in 2014, when frankly the market and new business opportunities are not there right now. Literally, I am between a rock and a hard place and would like to discuss with you one and one (sic) and come up with a plan.

(*Id.*) The remainder of the memorandum does not reveal its context but, when interpreted in the light most favorable to Associated Construction, it suggests that Hanover prioritized profit over probity in allowing Avalon and Adams to continue representing it in the Intext affair.

Hanover argues that it tried in good faith to fulfil its obligations under the Bonds after Intext's default. It is settled Connecticut law, however, that an insurer's knowing disregard of its obligations under a policy can constitute bad faith. *See Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 165 (D. Conn. 2014) (denying motion to dismiss claim for breach of the covenant of good faith and fair dealing against insurer in part because plaintiff had alleged that insurer denied coverage in knowing disregard of its obligations under the policy). As explained above, it is a jury question whether Hanover's interpretation of the Bonds—that it could perform by paying the cost of completion to subcontractors hired by Associated Construction up to the limit of the Bonds—is correct; but Associated Construction has submitted evidence that, when construed in its favor, suggests that Hanover decided it would be "far too expensive to perform or hire a contractor to perform the work" and chose instead to shirk its obligations to find another

contractor to complete the work to avoid paying this increased cost and thereby maximize its own profits. (Complaint at ¶¶ 77-78.) When that evidence is combined with Hanover's questionable interpretation of its own obligations under the Bonds, it is enough to raise a disputed issue of fact on the bad faith claim.

As such, I deny Hanover's motion for summary judgment with respect to the majority of Associated Construction's "Bad Faith" claim. I grant the motion with respect to the portions of the claim assailing Hanover for declining to act on the Bonds until after Intext was terminated, and for stating that its liability under the Bonds was capped at the amounts listed therein.

### D. Breach of Contract (Count One)

To prove a breach of contract claim under Connecticut law, a plaintiff must establish: "(1) the existence of a contract or agreement; (2) the defendant's breach of the contract or agreement; and (3) damages resulting from the breach." *Chem-Tek, Inc. v. General Motors Corp.*, 816 F. Supp. 123, 131 (D. Conn. 1993) (citing *O'Hara v. State*, 218 Conn. 628 (1991)). Associated Construction's breach of contract claim reiterates its allegations against Hanover for allegedly failing to perform under the Bonds and against its alleged agent, Lighthouse, for continuing to disburse funds to Intext after its default. (*See* Complaint at ¶¶ 51-59.) Hanover recycles its previous arguments in attacking this claim. It claims first that the allegations concerning its failure to act under the Bonds prior to Intext's termination are without merit. (ECF No. 152 at 36 (citing Complaint at ¶¶ 53 ("The Surety wrongfully and without justification refused to take any action because it claimed that Intext had not been terminated."), 56 ("[Associated Construction terminated Intext on July 15, 2014.")).) I agree with this contention for the reasons stated in my ruling on Associated Construction's CUTPA claim—Hanover's failure to perform under the Bonds prior to Intext's termination did not breach their terms.

Hanover next takes aim at Associated Construction's allegations that it did not perform under the Bonds. (*See id.* (citing Complaint at ¶ 57 ("The Surety failed to elect an option under the Performance Bonds' terms. It failed and refused to perform and it failed and refused to find any other contractor to complete the work as provided under the Performance Bonds.")).) I reject this argument for the reasons listed above—there remains a genuine issue of material fact concerning whether Hanover performed under the Bonds. Finally, Hanover argues that my ruling on the parties' motions to dismiss forecloses Associated Construction's allegations concerning Lighthouse's disbursement of funds after Intext's default. (*See id.* (citing Complaint at ¶ 54 ("The Disbursement Agent continued to disburse funds after default."); MTD Ruling at 10 (dismissing claim against Lighthouse for continuing to disburse funds after Intext's default)).) Although I denied Hanover's motion with respect to Associated Construction's similar allegations in its CUTPA count, the breach of contract claim presents a different question. As I noted in my ruling on the parties' motion to dismiss, Associated Construction's allegations that Lighthouse continued to disburse funds after Intext's default concerns an alleged breach of the DCAs. (MTD Ruling at 10.) Associated Construction cannot raise such a claim, however, as it "was neither a party nor a third-party beneficiary under the DCAs." (*See id.* at 10-14 (explaining why Associated Construction falls into neither of these categories).) Associated Construction's breach of contract claim against Hanover for the same conduct therefore fails as a matter of law.

For these reasons, I grant Hanover's motion for summary judgment with respect to Associated Construction's breach of contract allegations concerning the Surety's failure to perform on the Bonds before Intext's termination and with respect to the allegations concerning Lighthouse's continued disbursal of funds under the DCAs. I deny Hanover's motion with respect to the remainder of Associated Construction's breach of contract claim.

### E. Damages

Hanover contends that it is entitled to summary judgment with respect to Associated Construction's claims for lost profits, punitive damages, attorney's fees, and delay damages. (ECF No. 152 at 36.)  It first contends that Associated Construction is not entitled to delay damages under the Bonds.  (*Id.* at 37.)  In support of this proposition, Associated Construction cites three cases establishing this proposition with respect to contractors' defaults under surety bonds.  (*See id.* at 37 (citing *Marshall Contractors, Inc. v. Peerless Ins. Co.*, 827 F. Supp. 91, 95 (D.R.I. 1993) (concluding that obligee was not entitled to consequential damages for contractor's default under surety bond); *Am. Home Assur. Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 198 (Fla. 1992) (concluding that obligee was not entitled to delay damages for contractor's default under surety bond); *Downingtown Area Sch. Dist. v. Int'l Fid. Ins. Co.*, 769 A.2d 560, 565 (Pa. Commw. Ct. 2001) (same)).)  But a surety's liability for the breach of a contractor, i.e., a surety's exposure when the bond is triggered and the surety *performs* its obligations under the bond, is distinct from a surety's liability when it *breaches* the terms of the bond.  *See Marshall Contractors, Inc.*, 827 F. Supp. at 95 (noting that the court's conclusion that surety was not liable for consequential damages for contractor's breach under bond did "not necessarily relieve [the surety] from liability for consequential damages attributable to *its own* alleged breach of the performance bond").  If a surety breaches its bond by failing to perform, it is liable for breach of contract.  Under Connecticut law, a party bringing a claim for breach of contract is entitled to seek consequential damages.  *Ambrogio v. Beaver Road Associates*, 267 Conn. 148, 155 (2003) (noting that Connecticut law allows a party to seek consequential damages, including lost profits).  I therefore reject Hanover's motion for summary judgment with respect to Associated

Construction's claim for delay damages. For similar reasons, I also reject its challenge to Associated Construction's claim for lost profits. (*See* ECF No. 152 at 37.)

Hanover also moves for summary judgment with respect to Associated Construction's claim for attorney's fees and punitive damages. (*See id.* at 37-38.) The former is a nonstarter. CUTPA provides courts with the right to award parties attorneys' fees. *See* Conn. Gen. Stat. § 42-110g(d) ("In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery."); *Saturn Const. co., Inc. v. Premier Roofing Co., Inc.*, 238 Conn. 293, 311 (1996) (noting that plaintiff who establishes liability under CUTPA has right to pursue attorney's fees).

Hanover's argument against an award of punitive damages is more substantive but just as futile. It contends that there is no evidence that it committed any "outrageous conduct" sufficient to warrant punitive damages under CUTPA. (ECF No. 152 at 38 (quoting *Lydall, Inc. v. Ruschmeyer*, 282 Conn. 209, 245 (2007)). Connecticut law provides that "[t]he flavor of the basic requirement to justify an award of punitive or exemplary damages has been repeatedly described in terms of wanton and malicious injury, evil motive and violence . . . ." [P]unitive damages may be awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others." *Lydall, Inc.* at 245 (internal quotation marks omitted). Here, there are several pieces of evidence that suggest such conduct. As noted above, there is evidence that Hanover exhibited a reckless indifference to the actions of its alleged agents, Avalon and Adams, thereby resulting in the misrepresentations at the heart of this case. Further, there is at least some evidence that Hanover neglected its obligations under the

Performance Bonds. At the very least, there is enough evidence to deny Hanover judgment on the issue as a matter of law.

I therefore deny Hanover's motion for summary judgment with respect to Associated Construction's claim for damages.

## V.    Conclusion

For the reasons set forth above, Hanover's motion for summary judgment (ECF No. 151) is GRANTED IN PART AND DENIED IN PART. It is granted in full with respect to Associated Construction's CUIPA claim. It is granted in part with respect to the allegations contained in paragraph 62, subparts (a), (b), (e), and (f) of the CUTPA claim but denied as to the remaining parts of that claim. The motion is granted with respect to the allegations in the breach of contract claim contained in paragraphs 53, 54, and 56; it is denied with respect to all other parts of that claim. Finally, the motion is denied with respect to the majority of the bad faith claim, save for those portions of the claim concerning Hanover's refusal to perform on the Bonds prior to Intext's termination.

IT IS SO ORDERED.

      /s/                  
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            August 21, 2018