# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ASSOCIATED CONSTRUCTION / AP CONSTRUCTION, LLC<br>      Plaintiff,<br><br>      v.<br><br>THE HANOVER INSURANCE COMPANY, et al.<br>      Defendants. | No. 3:15-cv-1600 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

### I.      Introduction

This lawsuit arises out of surety bonds issued for a construction project in Stamford, Connecticut.  Associated Construction / A.P. Construction, LLC ("Associated Construction"), a construction contractor, alleges that the issuer of the bonds, Hanover Insurance Company ("Hanover" or the "Surety"), and its alleged agents, Scott Adams, Avalon Risk, LLC ("Avalon"), and Lighthouse Management, LLC ("Lighthouse"), failed to perform under the bonds and other related contracts and made misrepresentations in connection with the project.  Associated Construction brings claims for (i) breach of contract (count one); (ii) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. ("CUTPA") (count two); (iii) breach of the covenant of good faith and fair dealing (count three); and (iv) violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-815 et seq. ("CUIPA") (count four).

Now before me are motions for summary judgment brought by Lighthouse and Adams as to Associated Construction's CUTPA claim.[1]  (ECF No. 154; ECF No. 163.)  For the reasons that follow, these motions for summary judgment are DENIED.

## II.     Background

### A.  Factual Background

The following facts, which are taken from the parties' Local Rule 56(a) Statements[2] and the exhibits, are undisputed unless otherwise indicated.[3]

Associated Construction "was formed for the purpose of soliciting, obtaining and entering into a contract with Trinity Financial ("Trinity"), as owner, for the construction of a residential apartment building at 66 Summer Street, Stamford, Connecticut, known as 'Park Square West Phase II' (the 'Project')."  (ECF No. 155, Lighthouse's Local Rule 56(a)1 Statement ("LH's L.R. 56(a)1 Stmt.") at ¶ 2); ECF No. 180-1, Associated Construction's Local

---

[1]  Lighthouse's motion for summary judgment states that it is brought on behalf of itself "and Scott Adams . . . ."  (ECF No. 154 at 1.)  Since Adams has filed his own motion for summary judgment, however, I address the two motions separately.

[2]  Associated Construction contends that Adams's Local Rule 56(a) Statement exceeds the page limitations under the Local Rules and that the pages exceeding the Court's limits should not be reviewed.  (*See* ECF No. 181-1 at 1.)  Adams's statement, which is seventeen pages long, exceeds the limits under the Local Rules by five pages.  *See* D. Conn. L. R. 56(a)(1) ("The Local Rule 56(a)1 Statement shall be no longer than twelve (12) double-spaced pages, absent leave of the Court granted for good cause shown.").  If it were material to my result, I would grant Associated Construction's request to disregard the excessive pages.  Given my disposition, however, such an action in this context would unnecessarily complicate this ruling.  I therefore consider all of Adams's Local Rule 56(a) Statement, but admonish his counsel to be more mindful of this Court's Local Rules in the future.

[3]  Although Lighthouse and Adams filed separate motions for summary judgment, their Local Rule 56(a) Statements overlap significantly due to their similar interests.  I therefore draw from both Local Rule 56(a) Statements in setting out the factual background to this case.  All of the facts listed within are undisputed by Lighthouse, Adams, and Associated Construction unless otherwise noted.

Rule 56(a)2 Statement ("Pl.'s LH L.R. 56(a)2 Stmt.") at ¶ 2[4].; ECF No. 164, Adams's Local

Rule 56(a)1 Statement ("Adam's L.R. 56(a)1 Stmt.") at ¶ 2; ECF No. 181-1, Associated

Construction's Local Rule 56(a)2 Statement ("Pl.'s Adams 56(a)2 Stmt.") at ¶ 2.)  In September

of 2013, Associated Construction executed a "Letter of Intent to Award Subcontract" with Intext

Building Systems, LLC ("Intext") to perform various work on the Project ("Sheetrock Work").

(Adams's L.R. 56(a)1 Stmt. at ¶ 56; Pl.'s Adams 56(a)2 Stmt. at ¶ 56; ECF No. 167, Exhibit FF,

at 4-5 (letter of intent signed by representatives of Associated Construction and Intext).)[5]

### 1.  October 9, 2013 Meeting

Although the parties dispute how it took place, Intext and Associated Construction

ultimately agreed to "split [Intext's] scope of work into three subcontracts."  (Pl.'s LH L.R.

56(a)2 Stmt., Additional Material Facts at ¶ 22; ECF No. 167, Exhibit HH (email from

Associated Construction's management detailing three subcontracts); Adam's L.R. 56(a)1 Stmt.

at ¶ 60 (referring to Intext's three subcontracts).)  "On October 9, 2013, a meeting was held at

---

[4]  Associated Construction summarily denies this assertion when made by Lighthouse but admits the exact same fact in response to Adams's Local Rule 56(a) Statement.  (*Compare* Pl.'s L.R. 56(a)2 Stmt. at ¶ 2 ("Denied.  The document speaks for itself and requires no additional response.") *with* Pl.'s Adams L.R. 52(a)2 Stmt. at ¶ 2 (admitting the exact same fact).)  As such, I conclude that Associated Construction has admitted the fact in both cases.

[5]  Associated Construction summarily denies Adams's assertion in his Local Rule 56(a) Statement that Intext executed the Letter of Intent in September of 2013, noting instead that the "[t]he document speaks for itself and requires no additional response." (*See* Pl.'s Adams L.R. 56(a)2 Stmt. at ¶ 56).  Since Associated Construction provides no other basis for its denial and the document bears out Adams's assertion, I include Adams's assertion anyway.  I follow this practice in addressing other instances where Associated Construction advances similarly unsupported denials of factual assertions borne out in unchallenged evidence.  *See* D. Conn. L. R. 56(a)(3) ("[E]ach denial in an opponent's Local Rule 56(a)2 Statement . . . must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial. . . .  Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1 . . . .").

[Associated Construction's] jobsite office, which was attended by [vice president of Associated Construction Joseph] Jankowski, [executive vice president of Associated Construction Thomas] Walsh, [lead project manager at Associated Construction Joseph] Orlando, [Senior Vice President of Alliant Insurance Services Woodrow M. Baird], [Intext owner] Dean Coehlo, [Intext executive Steve] Ravis and [Scott] Adams.[6]" (Adam's L.R. 56(a)1 Stmt. at ¶ 67; Pl.'s Adams L.R. 56(a)2 Stmt. at ¶ 67.) Walsh stated in a subsequent affidavit that Adams, at the meeting, "advised [him] that [Adams] had authority to issue bonds to Intext for a face amount of $2 million per bond with $4,000,000 aggregate commitment" and that "the bonds [Adams] issued would in the aggregate cover the proposed contract amount and perform in the same manner as a single bond."[7] (*See* ECF No. 183-1, Affidavit of Thomas J. Walsh, III ("Pl.'s Walsh Aff.") at ¶ 10.)

The parties eventually agreed on the issuance of three performance bonds for the Sheetrock Work. (*See* ECF No. 167-19, Ex. SS ("Bonds") (the three signed performance bonds); Adams's L.R. 56(a)1 Stmt. at ¶ 93; Pl.'s Adam's L.R. 56(a)2 Stmt. at ¶ 93.) All of the bonds listed Intext[8] as the contractor, Associated Construction as the obligee, and Hanover as the

---

[6] Adams is the president of Avalon and Lighthouse. (ECF No. 167, Declaration of Scott Adams ("Adams Decl.") at ¶ 4; ECF No. 159-5, Deposition of Scott Adams ("LH's Adams Depo") at 215:13-17).) Avalon is "a licensed insurance agency" that provides bonding services, amongst other things. (Adams Decl. at ¶¶ 3, 7.) It also served as an agent for Hanover. (*Id.* at ¶ 7.) Lighthouse is "an ongoing active disbursement control agent"—in essence, it provides funds control for bonds. (LH's Adams Depo. at 218:2-4.)

[7] Adams contends in his Local Rule 56(a) Statement that a variety of persons present at the meeting either denied or did not recall him making such a statement; Associated construction denies or contests the vast majority of these statements. (*See* Adams L.R. 56(a)1 Stmt. at ¶¶ 68-75; Pl.'s Adams L.R. 56(a)2 Stmt. at ¶¶ 68-75.) Since I address the proof of this incident later in this ruling, I do not analyze it in detail here.

[8] The last bond lists IBS Contracting, LLC ("IBS"), an affiliate of Intext. (*See* Bonds at 26.) I refer to IBS and Intext collectively as Intext throughout this ruling.

surety.  (*See* Bonds at 1, 14, 26.)  The first bond was in the amount of $1,987,000 and applied to the "Framing Work."  (*See id.* at 1.)  The second bond was in the amount of $1,881,000 and pertained to the "Drywall Installation."  (*Id.* at 14.)  The final performance bond was listed at $642,000 and pertained to the "Drywall and Insulation Materials."  (*Id.* at 26.)  Each of the bonds was executed on November 1, 2013.  (Bonds at 1, 14, 26; Adams's L.R. 56(a)1 Stmt. at ¶ 93; Pl.'s Adam's L.R. 56(a)2 Stmt. at ¶ 93.)  Each bond granted Adams the power of attorney "to sign, execute, seal, acknowledge and deliver for . . . any and all bonds, recognizances, undertakings, contracts of indemnity, or other writings obligatory in the nature thereof " up to the amount of $5,000,000.  (*See id.* at 6, 20, 32.)  Further, the bonds were subject to "Avalon's review and approval" prior to their issuance.[9]  (Adams Decl. at ¶ 27.)

Shortly before these bonds were executed, Intext entered into a series of Disbursement Control Agreements ("DCAs") with Lighthouse.  (See ECF No. 166-1, Exhibit A at 161-72 (October 14, 2013 DCA signed by Coehlo and Adams), 255-66 (October 14, 2013, DCA signed by Coehlo and Adams), 304-15 (October 14, 2013 DCA signed by owner of IBS and Adams).)  The DCAs required Intext "to use the services of [Lighthouse] to receive and disburse all monies under the" subcontracts governing its work on the Project.  (*Id.* at 161, 255, 304.)  In effect, the DCAs set up Lighthouse as an intermediary between funds paid from Associated Construction to Intext for the Sheetrock Work.  The DCAs provide that "[i]n the event of a Default . . ., no Account Funds shall be disbursed without the prior written consent of the Surety."  (*Id.* at 165, 259, 308.)

### 2.  May 8, 2014 Meeting

---

[9]  Avalon approved the performance bonds on behalf of Hanover.  (*See* Adams Decl. at ¶ 29 ("Upon receiving the bond forms . . ., Avalon in its capacity as Hanover's agent, approved them . . . .").)

"On May 8, 2014, a meeting was held among Jankowski, Walsh, Ashforth, Orlando, Ravis, Adams and Baird to discuss Intext's performance." (LH's L.R. 56(a)1 Stmt. at ¶ 28; Pl.'s LH L.R. 56(a)2 Stmt. at ¶ 28; Adams's L.R. 56(a)1 Stmt. at ¶ 96; Pl.'s Adam's L.R. 56(a)2 Stmt. at ¶ 96.) The parties' accounts again diverge at this juncture. Associated Construction alleges that Lighthouse, having "failed to determine whether there were adequate funds in the funds control account when considered with the balance of the Contract Amount," "made representations to [Associated Construction] [at the meeting] that there were adequate funds to complete the Project."[10] (Complaint at ¶ 62(k).) Associated Construction also alleges that Adams misrepresented at the meeting "that the Surety would support Intext and enable Intext to complete [its work] on schedule for what [Associated Construction] agreed to pay Intext . . . ." (*Id.* at ¶ 62(j).) Lighthouse and Adams aver in their Local Rule 56(a) statements that Adams stated that Intext's "cash flow was not a problem," that this statement was not false when it was made, and that Associated Construction did not rely upon it in any event. (LH's L.R. 56(a)1 Stmt. at ¶¶ 29-39; Adams's L.R. 56(a)1 Stmt. at ¶¶ 97-107). Associated Construction denies or qualifies most of these statements. (*See* Pl.'s LH L.R. 56(a)2 Stmt. at ¶¶ 29-39; Pl.'s Adams L.R. 56(a)2 Stmt. at ¶¶ 29-39.) I address the parties' differing accounts further later in this ruling.

Associated Construction sent Intext a notice of default on June 2, 2014, and subsequently terminated Intext for failure to perform. (*See* ECF No. 168, Ex. 12 ("Notice of Default"));

---

[10] Although the Complaint avers that Lighthouse made this misrepresentation, it implies that Adams was the person who made this statement. (*See* Complaint at ¶ 32 (alleging that at May 8, 2014 meeting, Adams "represented to [Associated Construction] that cash flow was not a problem" and discussing statement made by Adams "about the viability of Intext and the ability to perform the work")).) Further, as noted above, the parties state that Adams was the only representative of Lighthouse to attend the meeting.

Adam's L.R. 56(a)1 Stmt. at ¶ 109; Pl.'s Adams L.R. 56(a)2 Stmt. at ¶ 109; ECF No. 159-6, Deposition of Joseph Jankowski ("LH's Jankowski Depo.") at 313:10-13 (Q: "And do you recall that . . . Intext was ultimately terminated by [Associated Construction]? You recall that?" A: "Yes.").) Associated Construction later alleged that Intext's default caused Trinity to reject its bid for the next phase of the Project. (*See* Complaint at ¶ 43 (asserting damages based on Trinity's refusal to give Associated Construction the next phase of the project).)

### B. Subsequent Relevant Procedural History

As a result of the events listed above, Associated Construction brought four claims against Hanover, Adams, and Lighthouse: (i) a breach of contract claim against Hanover only predicated upon Hanover's alleged breach of the "[p]erformance [b]onds' terms," along with the DCAs regulating the disbursement of funds to Intext (Complaint at ¶¶ 44-59); (ii) a CUTPA claim against all defendants based upon all of the conduct listed above (*id.* at ¶¶ 60-69); (iii) a breach of the covenant of good faith and fair dealing claim against all defendants predicated upon Adams's alleged misrepresentations and Hanover's failure to perform under the performance bonds following Intext's termination (*id.* at ¶¶ 70-82); and (iv) a CUIPA claim against all defendants that in effect mirrors the CUTPA claim (*id.* at ¶¶ 83-90). I granted Adams's and Lighthouse's subsequent motions to dismiss the breach of good faith and fair dealing and CUIPA claims against them. (*See* ECF No. 103 ("MTD Ruling").) Thus, the only remaining claim against Lighthouse and Adams is Associated Construction's CUTPA claim.

## III. Standard of Review

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the

light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

## IV.    Discussion

The parties' motions for summary judgment overlap at various points due to Adams's status as the president of Lighthouse. Lighthouse contends that it is not liable under CUTPA because the basis for the CUTPA claim is an allegation that it violated CUIPA, and CUIPA does not apply to it. Lighthouse also contends that, in any event, it is not liable for Adams's alleged misrepresentation at the May 8, 2014 meeting concerning Intext's cash flow. (*See* ECF No. 159 at 8, 10.) Adams contends that he is not liable for his alleged misrepresentations at the October 9, 2013 and May 8, 2014 meetings. (*See* ECF No. 165 at 5, 10.) Since the parties' motions overlap, I address them jointly. I begin with Lighthouse's contention that CUIPA does not apply to it and then address Adams's alleged misrepresentations.

### A.  Lighthouse's Liability Under CUIPA

Lighthouse contends that its activities, along with those of Adams on its behalf, are not sufficiently related to the performance bonds in this case to subject those activities to CUIPA by way of CUTPA. (ECF No. 159 at 8.) A party may bring a CUTPA claim predicated upon a violation of CUIPA. *See Mead v. Burns*, 199 Conn. 651, 663 (1986) (determining that "it is

possible to state a cause of action under CUTPA for a violation of CUIPA"). CUIPA provides

that "[n]o person shall engage in this state in any trade practice which is defined . . . as . . . an

unfair method of competition or an unfair or deceptive act or practice in the business of

insurance . . . ." Conn. Gen. Stat. § 38a-815. Although Lighthouse concedes that "Connecticut

courts have held that surety contracts fall within CUIPA's definition of 'the business of

insurance,'" it contends that Associated Construction "has failed to establish how the business of

Lighthouse has any identifiable relationship to the bonds or surety contracts in this matter."

(ECF No. 159 at 8.) For the reasons that follow, I disagree.

As an initial matter, there is somewhat sparse precedent discussing the scope of the term

"business of insurance" in CUIPA. The precedent available, however, suggests that the scope is

quite broad. As an initial matter, Connecticut law broadly defines the term "business of

insurance," albeit in the context of out-of-state insurers, as follows:

> "'[I]nsurer' includes all corporations, associations, partnerships, and individuals engaged as principals in the business of insurance . . . . Any of the following acts effected in this state . . . is defined to be doing an insurance business in this state: (1) The making of or proposing to make, as an insurer, an insurance contract; (2) the making of or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety; (3) the taking or receiving of any application for insurance; (4) the receiving or collection of any premium, commission, membership fees, assessments, dues or other consideration for any insurance or any part thereof; (5) the issuance or delivery of contracts of insurance to residents of this state or to persons authorized to do business in this state; (6) directly or indirectly acting as an agent for or otherwise representing or aiding on behalf of another any person or insurer in the solicitation, negotiation, procurement or effectuation of insurance or renewals thereof or in the dissemination of information as to coverage or rates, or forwarding of applications, or delivery of policies or contracts, or inspection of risks, a filing of rates or investigation or adjustment of claims or losses or in the transaction of matters subsequent to effectuation of the contract and arising out of it, or in any other manner representing or assisting a person or insurer in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this state. The provisions of this subdivision shall not operate to prohibit full-time salaried employees of a corporate insured from acting in the capacity of an insurance

manager or buyer in placing insurance on behalf of such employer; (7) the doing of or proposing to do any insurance business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of the general statutes relating to insurance; and (8) any other transactions of business in this state by an insurer. The venue of an act committed by mail is at the point where the matter transmitted by mail is delivered and takes effect.

Conn. Gen. Stat. § 38a-271(a). At least one Connecticut Superior Court has looked to this broad definition in defining the term as used in CUIPA. *See Travelers Cas. v. F&F Mech. Contractors, Inc.*, No. CV000444245S, 2001 WL 576662, at *3 (Conn. Super. Ct. May 8, 2001) (looking to Conn. Gen. Stat. § 38a-271 to define "business of insurance" as used in CUIPA).

Second, the Connecticut Supreme Court has defined the scope of CUIPA expansively in determining its preemptive ambit. In *State v. Acordia, Inc.*, the Connecticut Supreme Court held that a CUTPA claim predicated upon "an insurance related practice" had to be based on a violation of CUIPA or potentially "some other statute regulating a specific type of insurance related conduct." 310 Conn. 1, 37 (2013) ("Because CUIPA provides the exclusive and comprehensive source of public policy with respect to general insurance practices, we conclude that, unless an *insurance related practice* violates CUIPA or, arguably, some other statute regulating a specific type of insurance related conduct, it cannot be found to violate any public policy and, therefore, it cannot be found to violate CUTPA." (emphasis added)). Consistent with this broad construction, Connecticut courts have treated insurance brokers, claims adjusters, and insurance agents as subject to liability under CUIPA for their insurance practices. *See Brubaker v. Ranciato,* No. CV176068768S, 2018 WL 3015221, at *4 (Conn. Super. Ct. May 29, 2018) ("[C]ourts have found that public adjusters are generally subject to the requirements of CUIPA in regard to their insurance practices." (*citing LaFever v. Cambridge Mut. Fire Ins. Co.*, No. KNLCV156023771S, 2016 WL 3912091, at *4 (Conn. Super. Ct. June 9, 2016) ("CUIPA applies to a variety of insurance industry members, including adjusters."))); *Nazami v. Patrons*

*Mut. Ins. Co.*, 280 Conn. 619, 625-27 (2006) (considering requirements for pleading violation of

Conn. Gen. Stat. § 38a-816(1)(a) against insurance agent and insurer); *Acordia*, 310 Conn. at 27-

28 (discussing requirements for CUTPA violation based on CUIPA against insurance brokers).

Thus, Connecticut law supports a broad definition of "business of insurance" that includes any

insurance-related practices.

Lighthouse's role in the events underlying this case falls within this broad scope.  The

clearest connection between Lighthouse and the performance bonds at the heart of this case is

that the latter required Intext to use the disbursement services of the former to protect Hanover's

interests.  (*See* ECF No. 159-1, Explanation of the Funds Control Process Involving a Bonding

Company (document providing notice to Intext that: "As a condition for issuing its bond,

[Hanover] has required you to enter into an agreement for Lighthouse to handle the receipt and

the disbursement of funds on the project."); (ECF No. 159-3, Deposition of Thomas Walsh

("LH's Walsh Depo.") at 377: 16-22 (Q: "What did you understand Lighthouse's role to be on

this project beyond simply receiving, disbursing funds on behalf of Intext?"  A: "It was largely to

ensure that payments were being made – properly being made to the materialmen and suppliers

and the subcontractors that Intext employed."), 378: 22-25 ("Lighthouse was the funds control

agent under – as it was represented to us, under an obligation from Hanover to have a funds

control agent to protect the operations under the bond."); ECF No. 159-4, Deposition of Andrew

B. Ashforth ("LH's Ashforth Depo.") at 155: 14-19 (Q: "The payments flowed on this project

such that [Associated Construction] paid money that was due and owing to [Intext] to

Lighthouse, which would then disburse it to [Intext's] contractors, suppliers, and laborers.  Is that

right?"  A: "Correct.").)  Given that Lighthouse's services were used to facilitate the issuance

and operation of the performance bonds, and given that Lighthouse concedes that surety bonds

fall under CUIPA, Lighthouse's services related to insurance practices in such a manner as to draw them within the ambit of CUIPA.

Adams's simultaneous administration of the performance bonds through Avalon and the DCAs through Lighthouse further emphasizes this connection. As noted above, Adams helped facilitate the issuance of the performance bonds by reviewing and approving them through Avalon and providing funds disbursement for them through Lighthouse. Avalon and Lighthouse are located at the same address and listed at that same address on the performance bonds. (*See* ECF No. 159-5, LH's Adams Depo. at 347:11-21.) Adams testified during his deposition that he sent emails conducting Lighthouse business from his Avalon email address. (*See id.* at 288:18-20.) He also noted that he "[didn't] do a good job at differentiating [between his work with Avalon and Lighthouse]." (*Id.* at 361: 6-9.) Further, Adams noted that Lighthouse's chief source of income with respect to loan origination was fees assessed for funds control. (*Id.* at 361: 14-20 ("I am not really sure that either Avalon or Lighthouse can take compensation for loan origination, but I think we had our eye more on [another source of income], which was that these lenders were going to want funds control used and we would charge a fee for the services of the funds control in the normal course of events.").) Thus, even if Lighthouse's role in the disbursement of funds under the bond did not sufficiently tie it to the "business of insurance" to incur potential liability under CUIPA, the blurring of its leadership with that of Avalon—Hanover's agent in connection with the issuance of the surety bonds—draws it within the gravitational pull of CUIPA.

### B. Alleged Misrepresentations

Associated Construction alleges that Adams made several misrepresentations at the October 9, 2013 and May 8, 2014 meetings described above, one of which it also directly

attributed to Lighthouse. (*See* Complaint at ¶ 62(g-l).) CUIPA proscribes "[m]isrepresentations and false advertising of insurance policies." Conn. Gen. Stat. § 38a-816(1). In assessing a CUTPA claim asserting a violation of that provision, the Connecticut Supreme Court suggested that the plaintiff had to satisfy the four elements of a negligent misrepresentation claim: "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Nazami v. Patrons Mut. Ins. Co.,* 280 Conn. 619, 626 (2006). Whether the evidence in a case supports a claim of negligent misrepresentation is a question of fact. *See Mips v. Becon, Inc.*, 70 Conn. App. 556, 558 (2002) ("Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact . . . ." (quoting *Citino v. Redevelopment Agency*, 51 Conn. App. 262, 273-74 (1998)); *Miller v. Appleby*, 183 Conn. 51, 55 (1981) ("Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways. They present, however, issues of fact." (quoting *Hathaway v. Bornmann*, 137 Conn. 322, 324 (1950)).) I assess the defendants' challenges to each of Adams's alleged misrepresentations in turn.

### 1. October 9, 2013 Misrepresentation Concerning Three Bonds

#### a. Misrepresentation of Fact

Adams challenges Associated Construction's allegation that he made a negligent misrepresentation at the October 9, 2013 meeting by representing that the three performance bonds at issue in this case would act the same as a single bond. (*See* ECF No. 165 at 5.) Adams first disputes that he made such a statement at all. He notes that Baird testified that Adams never made any such representation, and that Associated Construction's meeting minutes and

Orlando's notes from the meeting are devoid of any reference to such a misrepresentation. (ECF No. 165 at 6-8.) This argument is a nonstarter. "On a motion for summary judgment, [a] court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issue of fact, but only to determine whether there are issues to be tried." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Here, Associated Construction presented the affidavit of Walsh attesting that Adams made the misrepresentation in question. (*See* Pl.'s Walsh Aff. at ¶ 9 ("At a face-to-face meeting in October 2013, Defendant Adams, a Managing General Agent of Hanover . . ., advised me that he had authority to issue bonds to Intext for a face amount of $2 million per bond with $4,000,000 aggregate commitment. He said that the bonds he issued would in the aggregate cover the proposed contract amount and perform in the same manner as a single bond.").) This creates a conflict of witness testimony as to a material fact that cannot be resolved by summary judgment.

Adams next asserts that he did not make any misrepresentation of fact, as opposed to a statement of opinion. (*Id.*) Under Connecticut law, a misrepresentation "must consist of a statement of a material past or present fact . . . . Statements of opinion . . . are not actionable." *Omega Engineering, Inc. v. Eastman Kodak Co.*, 908 F. Supp. 1084, 1097 (D. Conn. 1995). "Reliance on opinions is per se unjustifiable because opinions, unlike facts, do not purport to be incontrovertible." *Id.* "The test for whether a statement is one of opinion or fact is whether 'under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distinguished from one of opinion.'" *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987) (quoting *Crowther v. Guidone*, 183 Conn. 464, 468 (1981)).

Adams contends that his alleged statement that the bonds would perform exactly like a single bond "is a speculative opinion because at the time the misrepresentation was allegedly

made the performance bonds were not even in existence, and Adams had no part in drafting or preparing the bonds." (ECF No. 165 at 5.) In support of this proposition, Adams cites his own declaration submitted in support of this motion. (*See id.* at 5-6 (citing Adams Decl. at ¶ 24 ("[N]either Avalon nor I had any input or involvement in the preparation of the subcontracts or the performance bonds that were ultimately executed for the Project. To the contrary, it was [Alliant Insurance Services ("Alliant")] that pieced together the entire bond transaction, as the bonding agent for both [Associated Construction] and [Intext]."), ¶ 28 ("To be sure, annexed hereto as Exhibit "RR" is a true copy of an email from Alliant to Avalon dated November 1, 2013, in which Alliant attached copies of the three sets of proposed payment and performance bonds—one for each of the subcontracts at issue—for Avalon's review and execution.").)

Adams's declaration does not entitle him to judgment as a matter of law on this point. In fact, Adams's declaration suggests that he played a major role in the development, fashioning, and issuance of the performance bonds. He asserts in his declaration that the bonds issued to Intext were approved via Hanover's Emerging Contractors Program. (Adams Decl. at ¶ 15.) He also notes that the tripartite nature of the bonds stemmed from Hanover's restrictions on Avalon's bonding ability. (*See id.* at ¶ 17 ("I informed Baird that Avalon would not be able to issue a bond for Intext for the proposed subcontract, but that Avalon would consider issuing a bond if the parties were able to apportion the work into segregated, discrete scopes under separate subcontracts that were under $2 million each, and under $4 million in the aggregate, consistent with Hanover's bonding limits under the [Emerging Contractors Program].").) The performance bonds also required that Intext use Lighthouse—another venture owned by Adams—for the purposes of funds control. (*See id.* at ¶ 22 (averring that Hanover required Intext to use Lighthouse for funds control for Sheetrock Work).) Finally, the fact that Alliant

submitted drafts of the bonds to Avalon for its review suggests that Adams played an active role in deciding upon the content of the bonds. Adams confirms this impression when he notes in his declaration that "[u]pon receiving the bonds elected by Alliant, Avalon in its capacity as Hanover's agent, approved them as they are known as standard AIA 311 bonds which are widely used in the industry." (Adams Decl. at ¶ 29.) Given that Avalon—and by extension, Adams—played a key role in the shaping and approval of the bonds, Adam's assertion that he played no part in their drafting rings hollow—and at least creates a genuine dispute of fact about the degree of his involvement.

Even if Adams's declaration supported his assertion that he played a small part in preparing the bonds, it would not entitle him to summary judgment on the issue. Associated Construction attached an affidavit by Walsh attesting to a different version of events. (*See* Walsh states in his affidavit that "Mr. Adams developed the description of the scope of work for each of three subcontracts that covered the total amount of the bid and the scope of work covered by Intext's bid to [Associated Construction] . . . . The terms of the three bonds are the same. He also advised that Intext would have to hire Lighthouse . . . or Hanover would not issue the Bond." (Pl.'s Walsh Aff. at ¶ 12.) Walsh's representations also create a genuine issue of material fact concerning Adams's role in the issuance of the performance bonds at the heart of this case.

Adams's contention that his representation concerning the nature of the bonds would have been "speculative" given that they were not executed until November 1, 2013 is also unconvincing. As noted above, there is substantial evidence that Adams played a key role in the drafting of the performance bonds, and that he (or Avalon) was Hanover's agent in issuing bonds under the Emerging Contractors Program generally and thus had reason to know how such bonds would function—even before they were issued. Thus, his alleged representation that the bonds

would function in the same way as a single bond carried significant weight, or at the very least carried enough weight to raise an issue of material fact concerning whether "the representation was intended and understood as one of fact as distinguished from one of opinion." *Woodling*, 813 F.2d at 552.

Further, Connecticut courts have upheld negligent misrepresentation claims predicated upon alleged misrepresentations that hewed far closer to the line between fact and speculation. For example, in *Firgeleski v. Hubbell, Inc.*, No. CV98035287S, 2001 WL 1708813 (Conn. Super. Ct. Dec. 19, 2001), the Connecticut Superior Court rejected a defendant's motion for summary judgment with respect to a negligent misrepresentation claim predicated upon alleged years old oral representations to the plaintiff that he would not be terminated from his employment absent just cause. *Id.* at *8. In *Cousins v. Howell Corp.*, No. CV000378032, 2002 WL 1446943 (Conn. Super. Ct. June 6, 2002), a plaintiff alleged a claim of negligent misrepresentation against her employer based upon its alleged misrepresentations to her that she would be able to return to work after an expectedly long period of absence due to illness. *Id.* at *1. The defendant moved for summary judgment in part based on the contention that "there [was] no way that the defendant knew or should have known that any representations that were made were false at the time they were made because no one could have possibly predicted the duration or severity of the plaintiff's medical absence." *Id.* at *2. The court denied the defendant's motion. *Id.* at *3. Adams's alleged misrepresentation concerning the nature of the performance bonds that the parties were currently negotiating was less speculative than those involved in the cases above. For these reasons, I conclude that there is a genuine issue of material fact concerning whether Adams's alleged misrepresentations about the nature of the performance bonds were misrepresentations of fact.

Adams also contends that Associated Construction's management was highly sophisticated and should have understood that nothing in the plain text of the performance bonds guaranteed that the bonds would act as one bond. (ECF No. 165 at 6-7.) He also argues that "emails dating back to November 2012 unequivocally establish that [Associated Construction] was informed that Intext was not able to obtain a bond above $2 million per contract, and that the framing and drywall scope of work would have to be split into separate, smaller subcontracts." (*Id.* at 7.) Neither of these arguments moves the dial for Adams concerning whether he made a misrepresentation. The former contention goes more to reliance than to whether Adams made a misrepresentation. The latter contention, even if credited, does not bear upon whether Adams made a misrepresentation. Even if Associated Construction knew that Intext was not able to obtain a bond above $2 million per contract, such knowledge alone would shed little light on whether the bonds would operate in the same manner as a single bond.

### b. Knowledge of Falsity

Next, Adams contends that even if he did make a misrepresentation of fact, Associated Construction cannot demonstrate that he knew or should have known that his misrepresentation was false. (ECF No. 165 at 8.) In support of this contention, Adams reiterates his argument that he did not prepare the bonds and thus could not have known how the bonds would ultimately perform. (*Id.* at 8.) He also contends that Associated Construction and Baird were in the best position to know how the bonds would operate given their role in the drafting of the bonds. (*Id.*) But as shown, there is evidence to rebut the "could not have known contention" and, even if the latter contention is true, it does not absolve Adams of potential liability for his alleged misrepresentation. "Subsequent conduct may be probative of whether a declarant knew or should have known a statement was false at the time it was made." *Glazer v. Dress Barn, Inc.*,

274 Conn. 33, 75 (2005) (citing *Updike, Kelly & Spellacy, P.C. v. Beckett*, 269 Conn. 613, 644, (2004) (concluding that evidence that attorney's fees accrued well above estimate shortly after commencing litigation provided reasonable basis to conclude declarant should have known estimate was false when given)). As noted above, there is evidence that Adams's subsequent conduct included playing an integral role in the fashioning and approval of the bonds at issue. This, together with evidence that he was Hanover's agent in connection with bonds issued under the Emerging Contractors Program in general, raises a genuine issue of material fact concerning whether he knew or should have known how the bonds would ultimately operate. The extent to which Associated Construction and Baird should have realized how the bonds would operate is irrelevant to this element.

As such, there is a genuine issue of material fact concerning whether Adams knew or should have known that his alleged representation regarding how the bonds would function was false.

### c. Reliance

Finally, Adams contends that even if he did make a misrepresentation concerning the functioning of the bonds, Associated Construction did not rely on it or, at the very least, could not have reasonably relied upon it. (ECF No. 165 at 9.) This argument rests upon Adams's assertions that Walsh admitted that Associated Construction's failure to get the representation in writing was his own "oversight" and that Jankowski conceded that Associated Construction did not take any action in response to the alleged misrepresentation. (*Id.*) I address these contentions in turn, beginning with the reasonableness of Associated Construction's alleged reliance on Adams's misrepresentation. The reasonableness of a party's reliance on a misrepresentation is generally a question of fact. *See Williams Ford, Inc. v. Hartford Courant*

*Co.*, 232 Conn. 559, 580 (1995) ("We have consistently held that reasonableness is a question of fact for the trier to determine based on all the circumstances."); *Vertrue Inc. v. Meshkin*, 429 F.Supp.2d 479, 499–500 (D. Conn. 2006) (citing Connecticut cases) ("[T]he issue of whether Plaintiff's reliance on the representations were reasonable is a question of fact not properly decided on a motion to dismiss.").

Here, there is a genuine issue of material fact regarding the reasonableness of Associated Construction's reliance on Adams's purported misrepresentation. To be sure, Walsh did testify at his deposition that Associated Construction's failure to include anything in the subcontracts or performance bonds indicating that the three bonds would operate as a single bond "may have been an oversight." (*See* ECF No. 166-8, Deposition of Thomas J. Walsh, III ("Adam's Walsh Depo.") at 311:5-11 (Q: "Do you have anything in the subcontracts or bonds for [Intext] that indicates that the three bonds would operate as a single bond?" A: "I don't believe there is any specific language to that effect." Q: "Why not?" A: "It may have been an oversight.").) While this suggests that Walsh now admits he made a mistake in negotiating the drafting of the performance bonds, it does not establish that he and his company's reliance upon Adams's alleged misrepresentation was unreasonable. Indeed, the few cases where Connecticut courts have granted judgment on misrepresentation claims based upon oral representations that conflicted with subsequent contracts involved instances where the contract specifically disclaimed prior representations. *See, e.g.*, *Gibson v. Capano*, 241 Conn. 725, 727-28, 734 (1997) (upholding directed verdict in favor of defendants on claim concerning oral representations regarding status of house where plaintiffs entered into subsequent real estate contract disclaiming reliance on prior representations made by defendants—to wit, "neither the Seller, nor any representative of the seller has made any representation upon which the Buyer

relies with respect to the condition of the property covered in this agreement, except as hereinbefore expressly set forth . . . . [N]o oral statements or promises and no understanding not embodied in this Contract shall be of effect"); *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169, 197 (2013) (concluding defendant entitled to judgment on negligent misrepresentation claim that concerned two oral representations made before execution of contract containing merger clause: "The language of the merger clause made it clear to the plaintiff that VitalWorks did not intend to be bound by any representation made prior to the contract being signed and, therefore, reliance by the plaintiff on any such representation would not have been reasonable."). Adams points to no such language in the pertinent agreements here. Thus, there is a genuine issue of material fact concerning whether Associated Construction's reliance upon Adams's alleged misrepresentation was reasonable.

There is also a genuine issue of material fact concerning whether Associated Construction relied upon Adams's representation. Adams contends that Jankowski stated in his deposition that Associated Construction "did not make any decisions, take any actions or do anything in response to [Adams's alleged misrepresentations]." (ECF No. 165 at 9 (citing ECF No. 166-4, Deposition of Joseph Jankowski ("Adams's Jankowski Depo.") at 397:24-399:3).) The cited portions of Jankowski's deposition do not support Adams's contention. The relevant excerpt from Jankowski's deposition is as follows:

Q: So after leaving the October 9, 2013 meeting, what did you do after hearing that alleged statement from Mr. Adams?

. . .

A: Nothing out of the ordinary.

Q: How did Mr. Adams'[s] . . . alleged statement that the three bonds would function as one influence your decision-making or conduct in any way?

A: Decision-making in what regard?

Q: In any regard.  Did you make any decisions based on the alleged statement from Mr. Adams that the three bonds would be treated as one?

A: No.

Q: How about – did you take any actions at [Associated Construction] after hearing Mr. Adams' alleged statement that the three bonds would be treated as one?

A: Did I take any action?  No.

Q:  Did you rely upon that alleged statement from Mr. Adams that the three bonds would be treated as one in entering into the contract or subcontracts with [Intext]?

A:  Yes, we felt that the drywall work was going to be adequately bonded.  So we did – we did continue on with Intex[t].

(Adams's Jankowski Depo. at 398:11-399:10.)  The passage above belies Adams's contention that Associated Construction did not rely upon his alleged misrepresentation.  First, when asked directly whether he relied upon the alleged misrepresentation by Adams, Jankowski responded affirmatively.  Second, even if Jankowski did not rely upon Adams's alleged misrepresentation in making decisions going forward, that does not mean Associated Construction refrained from making any decisions in reliance on the misrepresentation.  Walsh testified that he had in fact relied upon Adams's representation.  (Pl.'s Walsh Depo. at 310-11 (Q: "At the October 9, 2013 meeting, did you ever tell Scott Adams that you were relying on his verbal statement at that meeting in any way that the three bonds would operate as one?"  A:  "We said at that meeting that – we asked for assurances that the three bonds would act as one, and the answer was yes. . . . Q: "Did you rely upon Mr. Adams's statement that the three bonds would operate as one in any way? . . .  A:  "Yes.").)  Further, Walsh also testified that Associated Construction may not have entered into the subcontracts with Intext without Adams's alleged misrepresentation.  (*See id.* at 313: 8-13 (Q:  "If Mr. Adams didn't' make that alleged statement at the October 9, 2013

meeting, that the three bonds would operate as one, would the plaintiff have entered into the three subcontracts with [Intext]?" A: "Maybe yes, maybe no. I don't know.").) Thus, there is a genuine issue of material fact concerning whether Associated Construction relied upon Adams's alleged misrepresentation.

For these reasons, Adams's motion for summary judgment is denied with respect to his alleged misrepresentation that the three performance bonds would act as one.

### 2. October 9, 2013 Misrepresentation Concerning Adams's Bonding Authority

Adams contends that he is entitled to judgment as a matter of law on Associated Construction's claim that he falsely stated that he lacked authority to issue a bond for the full amount of the Sheetrock Work. (ECF No. 165 at 10; *see* ECF No. 43 at ¶ 19.) In support of this contention, Adams points to a letter of authority between Avalon and Hanover for the Emerging Contractors Program providing for a single limit of $2,000,000 for surety bonds, along with an aggregate limit of $4,000,000 (*see* ECF No. 167-23, Ex. WW ("Letter of Authority"), and a 2012 email from Jankowski noting those limits (*see* ECF No. 166-23, Exhibit W (November 13, 2012 email from Jankowski stating that "[Intext's] bonding company will not bond a subcontract over $2 million, but will bond two subcontracts that total to the $3.5 million or so that is their price")).) Associated Construction's claim is predicated on a power of attorney form attached to each of the performance bonds providing Adams with the legal authority to issue "any and all bonds . . . not to exceed Five Million and No/100 ($5,000,000) in any single instance." (ECF No. 184-12, Exhibit 13 ("Power of Attorney"); Pl.'s Adams L.R. 56(a)2 Stmt., Additional Material Facts at ¶ 11 ("Pursuant to Mr. Adams'[s] power of attorney from Hanover, Mr. Adams had authority to write bonds up to $5,000,000.").)

Adams's deposition sheds light on the interplay between the Letter of Authority and Power of Attorney form. He testified that the Power of Attorney form "allow[ed] [him] to issue bonds up to 2 [million], over [4] million, on decisions [he had made within the limits of the Letter of Authority]," and that it "also allow[ed] [him] to sign the bond for bonds over [his] authority approved by Hanover." (*See* ECF No. 184-10, Deposition of Scott M. Adams ("Pl.'s Adams Depo.") at 235:13-17.) He then clarified that he "had discretionary authority to approve bonds up to $2 million within the terms of the [L]etter of [A]uthority" (*id.* at 21-23) but that he had to attain approval by "Hanover personnel prior to issuing a" bond that exceeded the $2 million singular limit (*id.* at 237:11-12.) In other words, Adams testified that the Letter of Authority granted him the discretionary authority to issue bonds up to a singular limit of $2 million and an aggregate limit of $4 million. The Power of Attorney allowed him to legally bind Hanover for such bonds. If he wished to issue a bond exceeding those limits, however, he could do so—up to the amount of $5 million—only if he received Hanover's approval first.

The key dispute between the parties, then, is whether Adams's representation concerning his authority to issue bonds was complete. Based upon Adams's arguments and the available evidence, this constitutes a genuine issue of material fact. According to his own deposition testimony, Adams had the ability to issue bonds above the $2 million limit as long as he received permission from Hanover. Adams does not contend that he informed Association Construction of this possibility. There are questions regarding the materiality of this representation, along with Associated Construction's reliance upon it. But Adams's motion does not raise any issues regarding the other required elements of a negligent misrepresentation claim with respect to the alleged statement about his bonding authority. As such, I reject his motion for summary judgment with respect to his alleged misrepresentation regarding his bonding authority.

### 3. May 8, 2014 Misrepresentation Concerning Intext's Cash Flow

#### a. Misrepresentation

Both Adams and Lighthouse contend that Adams's alleged statement that Intext's "cash flow was not a problem" at the May 8, 2014 meeting did not constitute a negligent misrepresentation. (*See* ECF No. 159 at 11; ECF No. 165 at 11.) They argue that Adams's statement was not a misrepresentation at the time it was made. (*Id.*) In support of this contention, they argue that based upon the information available to Adams and Lighthouse, there was no problem with Intext's cash flow at the time Adams's alleged representation was made. (*See id.*) Lighthouse contends separately that even if Adams's representation was false, it could not have known of its falsity based on the information available to it at the time. (*See* ECF No. 159 at 11.) There is evidence in the record that raises a genuine issue of material fact on these points, however, for both Adams and Lighthouse. In an email dated March 28, 2014, Adams wrote as follows to Baird:

> Woody-my concern with [Intext] is a BK Filing. It seems they owe money everywhere and there's no real telling how bad it is or who is close to getting judgments on them. The FC process forces trust fund discipline and if they could continue down that road and keep creditors happy with future payments based on profits earned project by project we'd be ok but I just don't know how bad it really is. I will also talk to Enfield Builders-it does appear to me that Enfield actually rescinded the default of Intext. Also, given Intext's reliance on labor subcontractors and their subs keep getting shut down, I don't have a good sense of who will do the work for them. Perhaps I should lay out a game plan of information I need to get comfortable and come visit them again next week to talk over this bond. On Monday when Fran gets back I will pull new TRW's and D&B and at least see if any liens or judgments are finding their way into the public record yet.

(ECF No. 184-9, Ex. 10 ("March 28, 2014 email").) Adams's email, which can be imputed to Lighthouse given his role as head of that company, raises a genuine issue of material fact concerning whether Intext was having cash flow problems by early May of 2014. If Adams was

concerned that Intext would go bankrupt in late March of 2014, there is at the very least an issue of material fact concerning Intext's solvency by early May of 2014.[11]

Adams's deposition testimony also lends credence to the contention that he was concerned about Intext's ability to continue paying its bills. He was asked about a March 31, 2014 message to Baird where he noted: "Incredibly, there are no judgments, suits or liens on the public records against Intext or them individually that we didn't know about before." (Pl.'s Adams Depo. at 350:9-14.) Adams testified:

> Well, in my recollection was that all this was being done in the context of a potential new bond being requested. And, therefore, I was looking back into the underwriting for a new bond. And what I was hearing from [Baird] and [Coehlo] is that they had a lot of bills out there on other jobs unpaid that were causing them problems. So I was expecting to see legal problems in the credit reports when I pulled them, but I didn't.

(*Id.* at 350:17-25.) Adams's admission that he realized Intext had unpaid bills as of late March, 2014 also creates a genuine issue of material fact concerning both Intext's financial condition a month later and Adams's knowledge of it. To be sure, both Adams and Lighthouse present evidence suggesting that Intext may have been financially sound at the time Adams made his representation. But I cannot weigh the parties' evidence in adjudicating a motion for summary judgment. I therefore conclude there is a genuine issue of material fact regarding whether Adams's alleged statement that Intext's "cash flow [was] not a problem" was a misrepresentation.

### b. Reliance

---

[11] Lighthouse argues in its reply brief that the phrase "cash flow" "could only be referencing funds paid to Intext for services already rendered and billed to [Associated Construction]," as opposed to future funds. (ECF No. 188 at 6.) But it does not provide any evidentiary support for this assertion, such as deposition testimony from Associated Construction acknowledging that is how it understood the somewhat vague phrase, "cash flow was not a problem." (ECF No. 43 at ¶ 32.)

Both Adams and Lighthouse contend that Associated Construction could not have reasonably relied upon Adams's alleged misrepresentation concerning Intext's financial solvency. They present two main arguments on this point. First, Adams contends that Associated Construction did not rely upon his alleged misrepresentation. (ECF No. 165 at 12.) Second, both Adams and Lighthouse contend that Associated Construction could not have reasonably relied upon Adams's alleged statement. (*Id.* at 11-12; ECF No. 159 at 12.) I address these contentions in turn. Adams's contention that Associated Construction did not rely upon his alleged misrepresentation rests upon false pretenses. He first states that Ashforth testified Associated Construction "did not rely upon, or change its conduct or dealings with Intext in any way based on Adams'[s] alleged [misrepresentation]." (ECF No. 165 at 12.) Ashforth's testimony, however, does not support this proposition. The following is the relevant testimony from Ashforth:

Q: How did you rely upon [the] statement, "cash flow is not a problem"?

A: Well, [Adams] told us it was not a problem.

Q: What did you do after you heard that?

A: I think if you look at it, we continued to fund our obligations towards the work that was completed.

Q: But did you change your course of conduct or the way you were dealing with Intext in any way after hearing that statement?

A: No. I think we were still pedal to the metal. We wanted some performance. We wanted them to do their job. We were told they could do their job.

. . .

Q: [If] [Adams] came to the meeting and said [Intext has cash flow problems], would you have done anything differently?

A: Probably would have put the screws down harder.

Q: Which means what?

A: Which means I would seek advice from [Walsh] and the rest of the executive team and find out how we can protect the project and protect the company.

(ECF No. 166-5, Exhibit E, Deposition of Andrew B. Ashforth ("Adams's Ashforth Depo.") at 134:19-136:24.)  The testimony above represents that Associated Construction would "[p]robably" have changed its policy toward Intext had Adams described its financial condition differently.  It therefore supports Associated Construction's contention that it relied upon Adams's alleged misrepresentation.

Adams also posits that Jankowski testified that Associated Construction did not rely upon Adams's statement.  (ECF No. 165 at 12.)  Once again, however, the full context of the testimony Adams cites supports a contrary conclusion.  The relevant passage of Jankowski's deposition testimony is as follows:

Q:  How was the plaintiff's decision-making or conduct influenced in any way by the statement or alleged statement from Mr. Adams that cash flow was not a problem as of May 8, 2014?

. . .

A:  Had we known that the cash flow situation was going to become a problem, we could have looked at different ways of protecting the amounts of money that we were spending or the amounts of money that we were giving out, meaning we could have taken steps to assure that the subcontractors were, in fact, getting paid and that the material suppliers were, in fact, getting paid on a timely basis.

Q:  Did you actually do anything differently based on Mr. Adams'[s] alleged statement on May 8, 2014?

. . .

A:  Than we were already doing?

Q:  Yes.

A:  No.

(Adams's Jankowski Depo. at 468-9-469:8.) Adams cites the latter portion of this testimony. (*See* ECF No. 165 at 12 (citing Adams's Jankowski Depo. at 469:2-8).) The earlier portion of this testimony, however, suggests that Ashforth meant to imply that Associated Construction *would have* acted differently had it believed that Intext had cash flow problems. This supports the view that Associated Construction relied upon Adams's representation. The fact that Associated Construction did not change its conduct in response to Adams's representation does not help Adams or Lighthouse; the issue is whether it would have changed its conduct had Adams represented differently, and there is a factual dispute on that point. I therefore conclude there is a genuine issue of material fact regarding whether Associated Construction relied upon Adams's alleged misrepresentation.

Adams's and Lighthouse's argument challenging the reasonableness of Associated Construction's reliance is similarly flawed. The gist of their arguments is that Associated Construction knew at the time it executed the subcontract with Intext in the fall of 2013 that the company had been having financial difficulties. (*See* ECF No. 159 at 12 (averring that Walsh "confirms that [Associated Construction] as far back as the fall of 2013 . . . had concerns about the financial stability of [Intext]" and that Jankowski also "admitted that he knew from the time [Associated Construction] was negotiating the subcontracts with Intext that cash flow was always going to be an issue for Intext"); ECF No. 165 at 11 (averring that Orlando raised concerns about Intext's "cash flow" in July of 2013 and that Intext's September 4, 2013 "proposal sets forth express terms for advances and accelerated payments that would be necessary in order to alleviate Intext's 'cash flow' problems"), 12 (arguing that a letter of intent prepared by Associated Construction noted that "Intext was not 'self-sufficient' and would require 3-6 months to generate enough of its own working capital").) None of this evidence,

however, sheds light upon whether Associated Construction justifiably relied upon Adams's alleged representation in *May 2014* that Intext *was not* having cash flow problems.

The closest the parties come to presenting relevant proof on this point are two pieces of evidence concerning Associated Construction's outlook on Intext in April 2014. The first of these is a statement from Walsh in his deposition that Associated Construction had forecast as of that time that Intext would not have enough money to finish the Project. (*See* LH's Walsh Depo. at 353:11-18 (Q: "How did you know that as of April 8, 2014, there was not enough money for Intext to complete the project?" A: "I believe it was our forecast for what the cost was that Intext would have to incur to finish the project and given the status on the job and the money that had been spent."). Drawing all inferences in favor of Associated Construction, however, I find this statement could be construed to suggest that Associated Construction had long-term concerns about Intext's financial solvency but not necessarily short term concerns about its cash flow. Further, Associated Construction could reasonably have inferred that Adams and Lighthouse, who were disbursing funds to Intext under the DCAs, had better information than it did about Intext's precise financial condition when Adams made the "cash flow" statement at the May 8, 2014 meeting. Thus, this piece of evidence does not tip the scales for Adams and Lighthouse. The second piece of evidence is an April 8, 2014 letter from Orlando to Ravis noting various deficiencies in Intext's performance. (*See* ECF No. 159-7, Exhibit G (informing Intext that "[y]our work has not met the requirements for planning, schedule, execution and quality control").) Like the prior statement, however, this letter does not necessarily suggest that Associated Construction had notice that Intext was having cash flow problems.

For these reasons, I conclude there is a genuine issue of material fact concerning whether Associated Construction reasonably relied upon Adams's alleged misrepresentation.[12]

### c. Pecuniary Harm

Lighthouse and Adams both contend that Associated Construction cannot prove that it suffered any pecuniary harm as a result of Adams's alleged misrepresentation. (*See* ECF No. 159 at 14; ECF No. 165 at 12-13.) Both parties' main argument concerns testimony from Patrick A.T. Lee, an executive officer at Trinity Financial. Lee testified that Trinity's decision not to accept Associated Construction's bid for the next phase of the Park Square West construction was entirely contingent on another contractor submitting a lower bid, as opposed to Intext's default. (*See* ECF No. 166-13, Exhibit M, Deposition of Patrick A.T. Lee ("Lee Depo.") at 20:4-19 (testifying that competing bidder's lower bid "was the only factor" in Trinity's decision to reject Associated Construction's bid for the next phase of the Project).) Lighthouse and Adams contend that this testimony short-circuits much of Associated Construction's claim for damages, which is in part premised on the assertion that Intext's default cost it the contract for the next phase of the Project. (*See* ECF No. 159 at 14 (citing Complaint at ¶ 43 ("[Associated Construction] has incurred damages of $6,000,000 in excess of the partial payment made in part to complete Intext's work because the Surety, [Lighthouse, Avalon, and Adams] and Intext failed to perform under the Subcontract and Performance Bond and because [Trinity] refused to give [Associated Construction] the next phase of the Project."); ECF No. 165 at 12.)

---

[12] Lighthouse also argues that it played a passive role in the administration of the Project and that it only facilitated payments from Associated Construction to Intext under the DCAs. (*See* ECF No. 159 at 13-14.) This argument has little bearing, however, on whether Associated Construction justifiably relied upon Adams's alleged misrepresentation.

Lighthouse and Adams have a strong argument that at least a portion of Associated Construction's claim for damages rests on flimsy premises. Yet they did not move for summary judgment on Associated Construction's claim for damages. To attain summary judgment on Association Construction's CUTPA claim, they must demonstrate that Adams's alleged misrepresentation did not cause Associated Construction *any* damages. *See* Conn. Gen. Stat. § 42-110g(a) ("Any person who suffers any ascertainable loss of money or property, real or personal, . . . may bring an action . . . to recover actual damages"). They do not meet this burden. Associated Construction alleged in its CUTPA claim that it "suffered ascertainable loss of more than $6,000,000, including, but not limited to, additional expense to complete the Sheetrock work, loss of profit on the construction of the second residential building and direct and indirect overhead." (Complaint at ¶ 43.) While Lee's testimony casts significant doubt upon Associated Construction's claim for consequential damages due to the loss of the contract for the next phase of the Project, it does not shed any light on Associated Construction's assertion of damages from the other sources noted—i.e., overhead and additional expense to complete the work that Intext could not.

The only argument Lighthouse and Adams present regarding these other potential sources of damages is the testimony of Ashforth and Jankowski discussing Associated Construction's response to Adams's alleged misrepresentation, which I addressed in the section above. (*See* ECF No. 159 at 15.) As noted previously, the fact that Associated Construction did not necessarily change its conduct in response to Adams's alleged misrepresentation does not mean that it would not have changed its conduct—and spared itself expense—had he made a different representation. Had Association Construction known of Intext's alleged financial struggles, it could have "put the screws down harder" on Intext, as Ashforth testified, or terminated Intext

prior to its default. As such, there is a genuine issue of material fact concerning whether Adams's alleged misrepresentation regarding Intext's financial health caused Associated Construction damages.

For these reasons, I deny Lighthouse's and Adams's motion for summary judgment with respect to Adams's alleged misrepresentation concerning Intext's cash flow problems.

### 4. May 8, 2014 Misrepresentation that Hanover Would Enable Intext to Complete the Sheetrock Work on Schedule

Adams also attacks Associated Construction's claim that he misrepresented that "the Surety would support Intext and enable Intext to complete the Sheetrock Work on schedule for what [Associated Construction] agreed to pay Intext." (ECF No. 165 at 13 (citing Complaint at ¶ 62(j)).) His main argument in support of this contention is that the claim "fails as a matter of law because it is not a statement of past or present fact." (*Id.*) He also contends in his reply brief that Associated Construction has failed to present any evidence that he made this representation. (ECF No. 189 at 11.) The latter argument is a nonstarter. Walsh stated in his affidavit that Adams "told [Associated Construction] he would support Intext and enable it to finish the work" and that "there was enough money in the job to finish the work." (Pl.'s Walsh Aff. at ¶ 14.) This affidavit creates a genuine issue of material fact concerning whether the representation took place.

The argument concerning the status of Adams's alleged misrepresentation also lacks merit. As an initial matter, one could reasonably interpret the representation noted above as a statement of present fact. After all, Associated Construction does not allege that Adams stated Hanover would support Intext if Intext defaulted. Rather, Adams's alleged misrepresentation provided that Hanover would support Intext in the present and enable it to complete the

Sheetrock Work. Even if one could characterize the alleged representation as a statement regarding a future event, it could still support liability under Connecticut law. The Connecticut Supreme Court has not "yet addressed whether statements of judgment or statements conditioned on future events can support a claim for misrepresentation . . . ." *Glazer*, 274 Conn. at 75 n. 32 (2005). It has held, however, "that a promise to do an act in the future, when coupled with a present intent not to fulfill the promise, is a false representation." *Paiva v. Vanech Heights Const. Co.*, 159 Conn. 512, 515 (1970). Drawing all inferences in Associated Construction's favor, I construe its claim concerning Adams's misrepresentation as alleging that Adams misrepresented that Hanover would support Intext and enable it to complete the Sheetrock Work on time when he knew full well that it would not.

I therefore deny Adams's motion for summary judgment with respect to his alleged representation that Hanover would support Intext and enable it to complete the Sheetrock Work on time.

### V.      Conclusion

For the reasons set forth above, the motions for summary judgment brought by Adams and Lighthouse as to Associated Construction's CUTPA claim (ECF No. 154; ECF No. 163) are DENIED.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                August 21, 2018